UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 15 CR 75 |
| | ) | |
| vs. | ) | Judge Virginia M. Kendall |
| | ) | |
| NAVINDER SINGH SARAO | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The UNITED STATES OF AMERICA respectfully submits this sentencing memorandum concerning the defendant, Navinder Singh Sarao. For the reasons set forth below—including the defendant's extraordinary cooperation with the government, the nature and circumstances of his offense, his individual history and characteristics, and the other pertinent factors set forth in 18 U.S.C. § 3553(a)—the government recommends that this Court depart significantly below the advisory Sentencing Guidelines range. Specifically, the government agrees with the Probation Officer and the defendant that a sentence of time served would be appropriate.

**I.      Procedural Background**

As the Court is aware, the defendant was arrested in the United Kingdom in April 2015 based on a criminal complaint charging him with wire fraud, commodities fraud and manipulation, and spoofing. He was detained in the United Kingdom for approximately four months before being released on conditional bail pending his extradition. In September 2015, a grand jury in this District returned a twenty-two count indictment against the defendant based on the same offenses as the complaint. He was extradited from the United Kingdom to the United States in November 2016 and, immediately upon his extradition, admitted responsibility for his offenses and began cooperating fully with the U.S. government. At his arraignment on November 9, 2016, he pleaded guilty to the wire fraud and spoofing counts of the indictment pursuant to a plea

agreement. His cooperation has continued since, and is now substantially complete. Sentencing is scheduled for January 28, 2020.

## II. Offense Conduct

Because the defendant's offense conduct is detailed in the Presentence Investigation Report ("PSR") and attached Government's Version of the Offense, and the Factual Basis of the parties' plea agreement, it is only summarized here. The defendant was a futures trader who resided at his parents' home in the United Kingdom and traded from proprietary trading companies in London and from his residence. He traded predominately in the market for E-Mini S&P 500 futures contracts (the "E-Mini"). During and in furtherance of his fraud scheme, from at least January 2009 through April 2014, the defendant placed thousands of large orders to buy or to sell E-mini futures contracts that he did not intend to execute (the "Spoof Orders").

The defendant's admitted intent in placing all of these Spoof Orders was to create a materially false and misleading impression of supply and demand in order to trick other traders to react to his false Spoof Order information and to buy or sell E-Mini futures contracts at prices, quantities, and/or times that, but for the defendant's Spoof Orders, they would not otherwise have traded. In thousands of instances, the defendant was able to induce other traders to buy or sell E-Mini futures contracts by placing the Spoof Orders, which had the additional purpose and effect of artificially depressing or inflating the price of E-mini futures contracts.

When his Spoof Orders caused a market reaction, the defendant frequently executed genuine orders to buy or sell E-mini futures contracts at prices that were artificially beneficial to him. The defendant was frequently able to generate significant trading profits from buying and selling his genuine orders close in time with the placement of the Spoof Orders.

The defendant generated Spoof Orders manually and using automated programs. One of the automated programs the defendant used to place Spoof Orders generated a block of typically five sell orders (the "Layered Sell Orders") that appeared in unison at different prices starting within a few price points (or "ticks") above the then-prevailing E-mini market price (the "Dynamic Layering Technique"). As the market price fluctuated, the Dynamic Layering Technique quickly shifted the Layered Sell Orders up or down in symmetry with the market movement, so that the Layered Sell Orders remained the same distance away from the then-prevailing market price, significantly reducing the likelihood that the Layered Sell Orders would be executed.

Another of the automated programs the defendant used to place Spoof Orders modified a particular order by increasing the size of the order by one lot. This automated program was triggered when other market participants entered their order after, and at the same price as, the defendant's order (the "Back-of-Queue Function"). The effect of the automatic one-lot increase in quantity was to revert the defendant's order to the back of the order line or "queue," behind all other orders entered at that price, thus significantly reducing the risk that the defendant's Back-of-Queue orders would be executed. Similar to the Dynamic Layering Technique, this program allowed the defendant to place Spoof Orders close to or at the best price on either side of the market with a higher degree of confidence that his Spoof Orders would not be executed.

One of the manual techniques the defendant used to place Spoof Orders was to place one or more 2,000-lot orders for E-mini futures contracts at the best sell or buy price (the "2,000-Lot Spoof Orders"). Another manual technique the defendant used to place Spoof Orders was to place resting orders in quantities of hundreds of lots, at least one or two levels away from the best bid or offers ("Resting Orders"), which he often placed in combination with other Spoof Orders.

3

The defendant intended to cancel—and typically would succeed in cancelling—his Spoof Orders before any part of the Spoof Order was executed. The defendant has admitted that the purpose and intent of his Spoof Orders was to create a false sense of supply or demand, induce other market participants to react, and drive the price of E-Mini futures contracts down or up, all so that the defendant could profit, mitigate his potential loss, or open or liquidate his genuine order positions at a more favorable price than was otherwise available before he placed the Spoof Order.

During his scheme—using the four techniques summarized above and in more detail in the PSR, Government's Version, and the Plea Agreement—the defendant made at least approximately $12.8 million in unlawful gain from trading genuine orders opposite his Spoof Orders.

### III. The Defendant's Extraordinary Cooperation Warrants a Significant Departure from the Advisory Guidelines Range and Weighs in Favor of the Government's Recommendation

The advisory Guidelines calculation set forth in the PSR is consistent with the parties' plea agreement.[1] The adjusted offense level of 28 and criminal history category of I result in an advisory Guidelines range of 78 to 97 months' imprisonment, in addition to any supervised release, fine, forfeiture, and restitution the Court may impose. However, based on the defendant's

---

[1] The government notes one difference between the analysis in the current PSR and the plea agreement: Paragraph 61 of the PSR applies a two-level enhancement under subsection (B) of USSG § 2B1.1(b)(10), because a substantial part of the fraudulent scheme was committed from outside the United States. (PSR ¶ 61.) In the plea agreement, however, the parties stipulated that this two-level enhancement applies under both subsections (B) *and* (C) of Section 2B1.1(b)(10) because: (1) a substantial part of the fraudulent scheme was committed from outside the United States; *and* (2) *the offense otherwise involved sophisticated means, and the defendant intentionally engaged in and caused the conduct constituting sophisticated means*. (*See* D.E. 62 ¶ 11(b)(v) (Plea Agreement).) For purposes of completeness (and without affecting the offense level computation or the government's recommendation), the government requests—without objection from the defense—that paragraph 61 of the PSR be revised to include the foregoing language regarding the application of subsection (C) (sophisticated means).

extraordinary cooperation—which has been timely, complete, truthful, and helpful to the government, as detailed in the Government's Version of the Offense and summarized below—the government will move this Court pursuant to USSG § 5K1.1 to depart significantly below the low-end of the Guidelines range.

### IV. The Factors Set Forth in 18 U.S.C. § 3553(a) Also Weigh in Favor of the Government's Recommendation

The Court should also consider the factors set forth in 18 U.S.C. § 3553(a), and impose a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing. Section 3553(a) requires the Court to consider, among other factors: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need to afford adequate deterrence and avoid unwarranted sentencing disparities among similarly situated defendants; and (4) the need for restitution. In this case, these factors are particularly instructive and weigh in favor of the government's recommended sentence of time served.

#### A. The Nature and Circumstances of the Defendant's Offense Weigh in Favor of the Government's Recommendation

The nature and circumstances of the defendant's offense weigh in favor of the government's recommended sentence. On the one hand, the defendant engaged in a serious and extensive fraud and spoofing scheme for over five years. He used sophisticated automated and manual deceptive and manipulative trading techniques, and affected thousands of market participants who traded at artificial prices to their detriment and to the defendant's benefit. The defendant knew his conduct was wrongful: He repeatedly complained to futures exchanges about what he perceived as similar patterns of conduct by other traders in an effort to stop their behavior. (*See* PSR ¶¶ 46-47.) Believing manipulation and spoofing to be rampant in the E-Mini market

5

and harmful to traders like himself, the defendant began engaging in this conduct, seeking to protect his own trading positions from other deceptive and manipulative traders. (*See id.* ¶ 54.)

On the other hand, despite engaging for years in conduct he recognized was wrongful, the defendant clearly was not motivated by money, greed, or any desire for a lavish lifestyle. As noted in the PSR, the defendant earned more than £45 million (GBP) in total trading profits—the equivalent of over $70 million USD—at least approximately $12.8 (USD) million of which was attributable to his fraud and spoofing scheme. He did not seem to care about any of that money, and did not use it to live anything approaching an extravagant lifestyle. His only significant purchase was a £5,000 GBP car. (*Id.* ¶ 118.) Of his remaining trading profits, the defendant *lost* over £40 million GBP to three apparently fraudulent investment schemes. (*Id.* ¶ 119.) The defendant has since surrendered his only remaining trading profits—approximately $7.6 million USD (which the defendant has represented to be and the government believes to be his only liquid assets)—to the United States in partial satisfaction of the $12.8 million forfeiture order in this case. Of that figure, the defendant paid $6.9 million (all that was available to him at the time) within just 10 days of his arraignment and guilty plea in November 2016. (*Id.* ¶ 52.)

Additional instructive aspects of the defendant's lifestyle are detailed in the PSR, including that he resides with and is cared for and supported by his parents, uses coupons to buy food at McDonald's, lives in a child-like bedroom that includes multiple stuffed animals (all facts that were also present throughout his offense conduct), and that his current primary income is from UK government benefits. (*Id.* ¶¶ 81-87; 108.) The defendant's utter lack of significant personal expenditures or extravagance sheds light on the nature and circumstances of his offense because they strongly indicate that he was not motivated by any greed whatsoever.

Rather, the defendant appears to have been driven by what he has described as an obsessive or addictive desire to excel at electronic trading. That the defendant has been diagnosed with autism, as discussed in the next section, also informs his trading behavior and conduct. His clinical psychologist has described the defendant's autism as "both a disability . . . and a talent." (*Id.* ¶ 94 (citing psychologist's report).) The government has observed the defendant in his own recorded trading videos using his keen ability to recognize and respond to patterns on his electronic trading screen. (The defendant generated videotapes of himself trading and committing the instant offense in an effort to record *other* traders' wrongful conduct—evidently not considering that he was also recording evidence of his own wrongdoing. (*See id.* ¶ 47.)) Based on these videos and debriefing sessions with the defendant, the government understands that he approached trading as if it were a sophisticated video game. He excelled at that "game." The byproduct of his trading excellence (buying low and selling high) was money, but to the defendant these profits may as well have been points on a scoreboard. These unusual aspects of the nature and circumstances of the defendant's offense weigh in favor of the government's recommendation.

### B. The Defendant's History and Characteristics Weigh Particularly Strongly in Favor of the Government's Recommendation

The defendant's individual history and characteristics weigh particularly strongly in favor of the government's recommendation. Because his history and characteristics are discussed in considerable detail in the PSR (*see id.* ¶¶ 51-54; 78-121), the government emphasizes the defendant's decision to cooperate, as well as the undersigned attorneys' observations of the defendant during the course of his cooperation.

As summarized in detail in the Government's Version, the defendant's cooperation has spanned years—from November 2016 through at least April 2019—and has been extraordinarily

timely, complete, truthful, and helpful to the government. His cooperation began immediately upon his extradition and surrender to U.S. authorities in November 2016. As an initial matter, the defendant's assistance was critical to the government's ability to secure over $7 million in overseas assets in partial satisfaction of the defendant's $12.8 million forfeiture obligation. As part of the defendant's cooperation, he provided the vast majority of these funds to the government within just 10 days of pleading guilty.

Substantively, beginning on the days before and after his arraignment and guilty plea before this Court, the defendant engaged in numerous hours-long debriefing sessions with the government. During his very first sessions, the defendant took full responsibility for his crime. He forthrightly and fulsomely explained his own criminal conduct and that of others who facilitated it, as well as the potentially criminal conduct of other anonymous traders whose patterns of trading the defendant observed and video-recorded on his electronic trading screen. The defendant used examples he culled from among hundreds of these video recordings to help him explain his own conduct and provide substantive and insightful analysis of general patterns and specific examples of others' conduct. His explanation of these trading videos was credible. In fact, several specific examples of the patterns that the defendant identified in videos of his trading screen (based solely on his own pattern recognition, without access to the underlying trade and order data) were corroborated by the government's independent data analysis. The defendant's keen insights and explanations regarding both general and specific patterns of deceptive and manipulative trading have illuminated the government's understanding of similar spoofing

8

schemes. As a result, he has substantially assisted and informed the government's nationwide efforts to detect, investigate, and prosecute these crimes.

The defendant's fulsome, candid, and very substantial cooperation was particularly essential throughout the investigation, prosecution, and, ultimately, the April 2019 trial in the case of *United States v. Thakkar*, 18 CR 36 (N.D. Ill.) (Gettleman, J.). Jitesh Thakkar was the founder and head of Edge Financial Technologies, a trading software company in Chicago, and provided the defendant with his Back-of-Queue function. Based in large part on the information the defendant provided (which was corroborated by documents and data), Thakkar was charged with conspiracy and aiding and abetting defendant Sarao's spoofing using the Back-of-Queue function. In advance of trial, Sarao engaged in lengthy substantive meetings with the government in the United Kingdom and Chicago to prepare his testimony. He explained, interpreted, and authenticated voluminous and complicated documents and other evidence—including his trading videos. He then testified candidly and forthrightly in this District over the course of two trial days. The defendant's critical trial testimony was subject to vigorous cross-examination and was fulsome and truthful. He straightforwardly and succinctly admitted and explained his own conduct, described his communications with and impressions of Thakkar, and explained relevant documents and records to the jury. Throughout his meetings with the government and his trial testimony, the defendant fulfilled both the letter and spirit of his obligation to tell the truth.

Although the defendant's cooperation with the government is complete, the government has no doubt that he would promptly make himself available to assist the government's investigative and prosecutorial efforts in the future if asked. The government also understands that the defendant is expected to testify in the Commodity Futures Trading Commission's

9

upcoming trial against Thakkar in the parallel civil enforcement action of *CFTC v. Thakkar*, 18 CV 619 (N.D. Ill.) (Pallmeyer, J.).

In addition to his decision to cooperate, the defendant's significant abilities and challenges—which the government understands to be effects of his autism—are highly relevant to assessing his individual history and characteristics (and the nature and circumstances of his offense, as discussed above). (*See* PSR ¶¶ 92-96.)

As noted in the PSR and by the defendant and his counsel during his plea hearing before this Court, and as the government anticipates the defendant's sentencing memorandum will address in more detail, the defendant has been diagnosed with "severe Asperger's" (now referred to as autism). (*See* Government's Version at n.5 and Ex. D at 5, 7, 42.) As a result, the defendant is particularly adept at pattern recognition, but also experiences significant challenges. (*See id.*; PSR ¶¶ 92-94 (citing psychologist's report).) Mindful of these issues, the government joined the defendant's request at his plea hearing to be released pending sentencing in large part so that the defendant would be as effective and accessible a cooperator as possible. The Court's granting that request and affording the defendant the ability to conduct and collate his nuanced pattern analysis from his residence and explain it to the government by discussing video-recorded examples in person—outside of a detention facility—was very valuable to the government. Such unfettered access would likewise be valuable should the government ever need to call upon the defendant's cooperation in the future.

In this connection, during the course of about ten debriefing and trial preparatory sessions, the government, including the undersigned personally, observed examples of the significant abilities and limitations that the defendant disclosed to this Court during his plea hearing and

10

testified about during the *Thakkar* proceedings, and that are described in the PSR. These include his: inability to maintain eye contact; tendency to hyper-focus or "obsess" over certain issues or interests; social difficulties; difficulties adapting to change; and sensory issues. (*See* Government's Version, Ex. E.1 (4/1/19 Trial Tr. at 86:1-24); PSR ¶¶ 92-94.) In addition, during the course of meetings with the defendant, including during his stay in Chicago for his testimony in the *Thakkar* trial last spring, the government observed how time away from home affected the defendant significantly. For example, during the *Thakkar* trial preparatory phase and trial in Chicago, the defendant reported being unable to sleep since leaving his home in the United Kingdom. During that time, he showed signs of sleep deprivation, illness, and deteriorated focus after just a few days away at a hotel (a far cry from a detention facility). His focus and energy seemed particularly depleted by the second day of his trial testimony.

        The government understands that the defendant will be submitting the report of an expert clinical psychologist who will describe the diagnosis and issues associated with the defendant's autism. Based on the PSR, the defendant's own candid account during his debriefings with the government and sworn testimony, and the government's non-expert, layperson's observations of him as described here, the government respectfully submits that additional incarceration beyond the time he has already served would pose particularly severe challenges for the defendant. (*See, e.g.*, PSR ¶¶ 92-93; 97.) Additional incarceration would also pose no benefit to him or to society.

        The defendant's decision timely and fully to accept responsibility for his crimes and cooperate, as well as his significant talents and disabilities, are all important aspects of his individual history and characteristics. These and the additional aspects addressed in the PSR weigh strongly in favor of the government's recommended sentence.

### C. The Government's Recommendation Would Provide Adequate Deterrence and Would Not Result in Unwarranted Sentencing Disparities

The government's recommended sentence is adequate to deter this defendant from further crime. He lacks any other criminal history; immediately accepted responsibility; extensively cooperated with the government; and has complied completely with his conditions of pre-sentence release. He has also expressed complete remorse—"punishing himself mentally" and "crush[ing] himself" (*see id.* ¶ 51)—for the instant offense, which he also recognizes has exposed himself and his family to extensive and embarrassing publicity. In the government's view, the defendant poses zero risk of recidivism that would warrant additional incarceration.

The government's recommended sentence also would not cause unwarranted sentencing disparities among defendants found guilty of similar conduct. For example, while the defendant's fraud and spoofing scheme in this case was similar in some respects to the offense in *United States v. Coscia*, 14 CR 551 (N.D. Ill.), the defendant's extraordinary acceptance of responsibility, cooperation, conduct, and individual characteristics are materially different from Coscia's conduct and character. Among other things, Coscia consistently denied responsibility for his conduct and was found to have lied under oath during his trial. (*See id.*, 14 CR 551, D.E. 162 (7/15/16 Sent'g Tr. at 21:22-22:8 (applying obstruction of justice enhancement and denying acceptance of responsibility reduction)).) As the Seventh Circuit has reasoned, "a sentencing difference is not a forbidden 'disparity' if it is justified by legitimate considerations, such as rewards for cooperation." *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006).

### D. Restitution Is Not Appropriate Given the Current Posture of this Case

Restitution to victims of certain offenses—including wire fraud, one of the defendant's offenses of conviction—is mandatory pursuant to 18 U.S.C. § 3663A. However, Section 3663A

12

allows for exceptions under certain circumstances that inform the analysis in this case. Because the defendant's Spoof Orders may have affected thousands of counterparties and other market participants—all possible crime victims—the number of identifiable victims may be so large as to make restitution impracticable. *See* 18 U.S.C. § 3663A(c)(3). In addition, determining complex issues of fact relating to the amount of the victim's losses would complicate or prolong the sentencing process to such a degree that the need to provide restitution to any victim may be outweighed by the burden on the sentencing process. *See id.*

As the Court is aware, the government has taken reasonable steps to notify possible victims in this case, which has also been the subject of a great deal of public media reports since the defendant's arrest in April 2015. On June 17, 2019, this Court granted the government's unopposed motion to authorize alternative victim notification procedures through publication on a Department of Justice website—finding in part that it was impracticable for the government to notify the numerous possible crime victims in this case of their rights on an individual basis. (D.E. 104.) Pursuant to the Court's order, the government has published and periodically updated its victim notification webpage, among other things, to solicit any victim impact statements by January 13, 2020. To date, the government has not received any inquiries about the case from possible victims nor has it received any victim impact statements. The anonymous nature of the E-Mini futures market may make it difficult for possible victims of the defendant's crime to independently recognize and identify themselves as such. In addition, in this case, even those who nonetheless identify themselves as possible victims may be discouraged from coming forward for compensation due to public media reports and filings in these proceedings indicating that the defendant forfeited all of his available funds to the United States.

In addition, proactively identifying possible victims and their estimated losses from among the thousands of counterparties and other market participants who were affected by the defendant's Spoof Orders would be very costly to the government. This would include analyzing trading data to identify possible victims who traded while the defendant's Spoof Orders were active in the market and to estimate the extent to which each was harmed as a result of the defendant's conduct. The government does have the ability to undertake such a market loss analysis and identify victims for compensation and has done so in other cases, particularly where criminal charges are still pending. (*See, e.g.*, Deferred Prosecution Agreement, *United States v. Tower Research Capital LLC*, 19 CR 819 (S.D. Tex. Nov. 6, 2019) (corporate deferred prosecution agreement, including agreement to pay approximately $32.5 million to government-administered victim compensation fund, where charges remain pending against one individual defendant).) Given the posture of this case, however, which was promptly resolved by the defendant's guilty plea and cooperation starting in 2016, the government has conserved its limited resources rather than undertaking this costly analysis. This has also allowed the government to focus its resources on investigating and prosecuting similar deceptive and manipulative conduct—substantially assisted by the defendant's cooperation as discussed above.

Notwithstanding the foregoing challenges and significant costs, should any possible victims come forward and submit victim impact statements prior to the sentencing hearing on January 28, 2020, the government would attempt to investigate and analyze their claims expeditiously and be prepared at sentencing to inform the Court of the status of that analysis and the government's recommended next steps. Absent receipt of any victim impact statements by

14

January 28, 2020, and unless the Court should order otherwise, the government respectfully submits that no restitution order should be issued in this case.

## V. Conclusion

For the foregoing reasons, the government respectfully recommends that this Court depart significantly below the advisory sentencing guidelines range, sentence the defendant to a term of time served, and include the order of forfeiture as part of the judgment.

Respectfully submitted,

ROBERT A. ZINK
Chief

By: */s/ Michael T. O'Neill*
MICHAEL T. O'NEILL
Assistant Chief
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue, N.W.
Washington, DC 20005
michael.t.oneill@usdoj.gov
(202) 616-1545

Dated: January 14, 2020

**CERTIFICATE OF SERVICE**

I, Michael T. O'Neill, certify that on January 14, 2020, I caused the foregoing Sentencing Memorandum to be electronically filed with the Clerk of Court by using the Court's electronic filing system, which will automatically send a notice of electronic filing to all parties.

*/s/ Michael T. O'Neill*
MICHAEL T. O'NEILL
Assistant Chief
Fraud Section, Criminal Division
U.S. Department of Justice