## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,

          Plaintiff,

    v.

NAVINDER SINGH SARAO,

          Defendant.

Case No.  No. 15 CR 75

Judge Virginia M. Kendall

## <u>SENTENCING MEMORANDUM OF NAVINDER SARAO</u>

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

I.    Time served is the just sentence ................................................................................ 7

    A.    Nav's Personal History And Characteristics ........................................... 7

        1.    Nav's Autism ................................................................................ 14

    B.    The Nature And Circumstances Of The Offense .................................... 19

        1.    A Fraud That Was Not Committed for the Money ................................. 19

        2.    A Crime Committed With The Requisite Intent, But Without Moral Culpability ................................................................................ 21

    C.    A Sentence of Time Served Satisfies the Goals of Punishment and Deterrence ............................................................................................... 24

        1.    Nav Has Been Punished Severely ............................................... 24

        2.    Deterrence ................................................................................... 25

            a.    Nav Poses No Risk of Recidivism ................................. 25

            b.    Nav's Prosecution Has Provided Enormous General Deterrence ...................................................................... 26

            c.    A Sentence of Time Served Will Best Provide Nav with the Care He Needs ...................................................... 27

    D.    The Kinds of Sentences Available ........................................................ 28

        1.    Incarceration in a U.S. Low Security Prison Would Be Dangerously Harsh ..................................................................... 28

        2.    Other Types of Punishment Are Available ................................. 30

            a.    Home Confinement ....................................................... 30

            b.    Community Service ........................................................ 31

    E.    The Sentencing Guidelines Range Should Be Disregarded ................... 31

    F.    A Sentence of Time Served Will Not Create Unwarranted Sentencing Disparities ............................................................................................. 34

CONCLUSION ............................................................................................................... 34

# TABLE OF AUTHORITIES

**Page**

CASES

*Abdul-Kabir v. Quarterman,*
550 U.S. 233 (2007)................................................................21

*Graham v. Florida,*
560 U.S. 48 (2010)................................................................21

*Handa v. Clark,*
401 F.3d 1129 (9th Cir. 2015) ................................................30

*Kimbrough v. United States,*
552 U.S. 85 (2007)................................................................32

*Pepper v. United States,*
562 U.S. 476 (2011)................................................................31

*Rita v. United States,*
551 U.S. 338 (2007)................................................................31

*United States v. Adelson,*
441 F. Supp. 2d 506 (S.D.N.Y. 2006)................................32, 33

*United States v. Algahaim,*
842 F.3d 796 (2d Cir. 2016)................................................32

*United States v. Corsey,*
723 F.3d 366 (2nd Cir. 2013)................................................33

*United States v. D.W.,*
198 F. Supp. 3d 18, 136 (E.D.N.Y. 2016) ............................24

*United States v. Desmond,*
No. 05 CR 792-F, 2008 WL 686779 (N.D. Ill. Mar. 11, 2008)................34

*United States v. Gonzalez,*
945 F.2d 525 (2d Cir. 1991)................................................24

*United States v. Johnson,*
No. 16-CR-457-1 (NGG), 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018)............33

*United States v. Lawrence,*
254 F.Supp.3d 441, 453 (E.D.N.Y. 2017) ............................24

*United States v. Moreno-Garcia*,
   551 F. App'x 387 (9th Cir. 2014) ........................................................34

*United States v. Musgrave*,
   647 Fed.Appx. 529 (6th Cir. 2016) .....................................................24

*United States v. Parris*,
   573 F. Supp. 2d 744 (E.D.N.Y. 2008) .................................................31

*United States v. Ramirez-Ramirez*,
   365 F. Supp. 2d 728 (E.D. Va. 2005) ..................................................30

*United States v. Ranum*,
   353 F. Supp. 2d 984 (E.D. Wis. 2005)..................................................20

*United States v. Roth*,
   No. 05 CR 792-5, 2008 WL 686783 (N.D. Ill. Mar. 11, 2008) ..................20, 25, 34

*United States v. Sheppard*,
   612 F.Supp. 194 (S.D. Va. 1985)..........................................................34

*United States v. Villazan*,
   No. 05 CR 792-1, 2008 WL 686781 (N.D. Ill. Mar. 11, 2008) ...............34

*United States v. Warner*,
   792 F.3d 847 (7th Cir. 2015) ...............................................................25

*United States v. Watt*,
   707 F. Supp. 2d 149 (D. Mass. 2010) ..................................................33

*United States v. Whigham*,
   754 F. Supp. 2d 239 (D. Mass. 2010) ..................................................31

STATUTES

8 U.S.C. § 1226(c) ....................................................................................29

18 U.S.C. § 3553......................................................................................33

Dodd-Frank Wall Street Reform and Consumer Protection Act. Pub. L. No. 111-
   203, § 929-Z, 124 Stat. 1376, 1871 (2010) (codified at 15 U.S.C. § 78o) ............................21

OTHER AUTHORITIES

(2016), HTTPS://WWW.BRANDEINS.DE/MAGAZINE/BRAND-EINS-
   WIRTSCHAFTSMAGAZIN/2016/GESUNDHEIT/BEZAHLT-WURDE-NOCH-NICHT............................12

ACLU (2008), HTTPS://ACLUM.ORG/WP-CONTENT/UPLOADS/2015/ 06/REPORTS-
   DETENTION-AND-DEPORTATION-IN-THE-AGE-OF-ICE.PDF ........................................30

BOP Program Statement 5100.08 ...................................................................................28

FED. SENT'G REP. 167, 168 (2008)..............................................................................33

Frank O. Bowman, III, *Sentencing High-Loss Corporate Frauds After* .......................33

GAO, "BUREAU OF PRISONS: GROWING INMATE CROWDING NEGATIVELY AFFECTS
     INMATES, STAFF, AND INFRASTRUCTURE," ...............................................................28

GUARDIAN (MAY 8, 2017), HTTPS://WWW.THEGUARDIAN.COM/US-
     NEWS/2017/MAY/08/IMMIGRANT-DETENTION-CENTERS-MEDICAL-CARE-DEATHS ..................30

HIGH-FREQUENCY TRADER INDICTED FOR MANIPULATING COMMODITIES FUTURES
     MARKETS IN FIRST FEDERAL PROSECUTION FOR "SPOOFING",
     HTTPS://WWW.JUSTICE.GOV/USAO-NDIL/PR/HIGH-FREQUENCY-TRADER-
     INDICTED-MANIPULATING-COMMODITIES-FUTURES-MARKETS-FIRST-FEDERAL
     (OCT. 2, 2014) ...........................................................................................................22

Ingo Malcher, *Bezahlt wurde noch nicht* ......................................................................12

Meng-Chuan Lai, Simon Baron-Cohen, *Identifying the Lost Generation of Adults
     with Autism Spectrum Conditions*..........................................................................15

Rory Carroll, *Immigration Detention Centers Marred by "Needless Deaths,"*............30

*Why the World Expert on Aspberger's took 30 Years to Notice Condition in His
     Own Son*, THE GUARDIAN (Sept. 25, 2017),
     https://amp.theguardian.com/society/2017/sep/25/why-the-world-expert-on-
     aspergers-took-30-years-to-notice-condition-in-his-own-son; .................................15

## INTRODUCTION

Every sentence must be tailored to the individual defendant and crime of conviction. Navinder Sarao, whose autism permeates every aspect of his life—and is central to understanding how and why he committed the crime, the extraordinary value of the cooperation that followed his prosecution, and the effects his conviction has had and will have on him—is utterly and profoundly unique. Understanding who he is, and the path that brought him to Your Honor for sentencing, leads to only one result—the same result arrived at by probation and the government—that time served is the right and just sentence.

Navinder Sarao is:

- A 41-year-old man who spends his days and nights in the same small bedroom he is lived in since he was a boy, with stuffed animals on his bed, computer games in his bookshelf, and blankets hung over the windows to try to escape the light to which he is exquisitely sensitive;

- A mathematical savant who, separate and apart from the crime of conviction, earned tens of millions of dollars legitimately trading from his bedroom against the world's most sophisticated counterparties (including high frequency algorithms trading at thousands of times his speed), before a trio of fraudsters swindled him out of over $60 million through simple, obvious frauds (e.g., a Ponzi scheme promising 11% returns compounded quarterly on a supposed investment where the invested funds would never leave a bank savings account);

- A public benefits recipient, living on $336 a month for the last four years, whose lifestyle is identical the many prior years when his net worth exceeded $70 million;

- A man who starts each day feeding birds, travels by bicycle, prefers the company of children, looks forward to McDonalds, video and soccer games with delight and requires the care of his parents to live, yet stands convicted of conducting a sophisticated, multimillion dollar fraud on the world's busiest futures market thousands of miles from his home;

- A man convicted of a multimillion dollar fraud who does not care about money and did not commit his fraud in order to obtain it, but who figured out how to copycat the adversaries he saw cheating at the game raging on his bedroom computer and then used their own cheats against them;

- A felon who repeatedly complained to the authorities about the cheaters' behavior, copied it when it continued, and then videotaped himself committing the same

crime (better than they were) for hundreds of hours in order to document their cheating (not realizing he was documenting his own, too);

- A singularly sunny, childlike, guileless, trusting person who is instantly beloved by all who encounter him, including the FBI agents and prosecutors who convicted him (who, in turn, he immediately trusts and loves);

- An autism sufferer so sensitive to light, sound and social stimulus that his prior incarceration was a literal torture, excepting the few days he spent in solitary confinement—a brief period he exudes relief when discussing;

- A client facing significant jail time who nevertheless repeatedly sought to enlist his lawyer to join a campaign to convince his parents to allow him to keep rabbits;

- A man with other-worldly pattern recognition ability, who creates and keeps in his head libraries of charts detailing a market's microsecond to microsecond price fluctuations over five-minute periods stretching back years who, when he worked in an office, would show up with his pajama bottoms poking out from under his pants and forget to remove his bicycle helmet before starting to trade;

- A tycoon with command of a vast fortune who told no friends or family about it for fear they would treat him differently, and whose most expensive purchase during that time was a second-hand Volkswagen worth £5,000 which he abandoned soon after purchase on a London street because he encountered a road closed sign on his known route home (after which he stopped driving because it was too stressful).

In his letter to the Court, Professor Simon Baron-Cohen, one of the world's foremost authorities on autism, who diagnosed Nav following a clinical examination, wrote:

> Navinder's lack of any concern for or use of the money he earned, and his trading obsessively, like a child trying to beat a high score on a computer game, are wholly consistent with, and a consequence of his autism. He was "playing the game" according to the rules he saw other traders were using, which included "spoofing." When he complained to the regulators about this behaviour and it continued, this would have enforced that these were the rules of the game. Autistic people are known to follow rules because of their need for total clarity. Navinder's autism would not permit him to make a nuanced judgement about the differences between effective rules and written rules, or that behaviour could be widely and obviously in use and still strictly prohibited. He would view the game as played and play by those rules. There is no doubt in my mind that if he understood at the time that his behaviour was truly criminal, he would never have engaged in it.

Baron-Cohen Ltr., Ex. A, at 4.

2

Representing Nav has been profoundly frustrating.[1]  He cannot turn off his autism and focus on what is important and needs to be done.  With his life on the line, he remains indelibly who he is, lodged in the present moment, perceiving the world as he does.[2]  This observation—that Nav's autism is wholly inseparable from who he is and cannot be controlled—seems obvious, but took years for me to fully absorb despite hundreds of hours of first-hand experience.  This is critical to understanding Nav, and thus, the case, because there is no point where he had a different perspective; no point where he could stop being him and see the world through another set of eyes.

Nav knew that spoofing was wrong.  People were cheating at the thing that obsessed him to a degree that does not have a non-autistic analogue—e.g., he often traded for 48 hours without sleep with total focus[3]—and the cheating he saw, in turn, obsessed him equally.  His pattern recognition skills allowed him to see their cheating, plain as day, in the numbers flashing up and down on his screen from microsecond to microsecond.  It hurt his trading, and it drove him to distraction.  When he complained to the Chicago Mercantile Exchange—over and over and over again for months—and when they failed to take action, he began to do what he complained about.

---

[1]  Throughout this memorandum, in an effort to communicate more fully who Nav is, I have included my own observations of Nav and certain facts I learned during my four years representing him.  I chose to include them here rather than waiting to convey them orally at sentencing because I believe they help shed light on Nav, and thus wanted to make them available to the Court in its deliberations prior to sentencing.

[2]  To take one small example, I have made no progress in our years-long debate about whether to argue his punishment should include trading S&P 500 E-mini futures for the U.S. government.  We have agreed to disagree, and he has very reluctantly, after dozens of unavoidable discussions, deferred to my area of expertise on the idea's viability.

[3]  His focus is difficult to fathom.  Nav describes himself as a charts trader, who makes his own charts of what he sees and keeps them in his head.  The charts detail five-minute slices of market micro-movements he is repeatedly witnessed that presage larger market movements.  To observe these patterns, and trade in response to them, he needed to be so focused that he could react to price and liquidity changes from second to second (or less—the trade data shows him at times responding to market changes in well under a second).  That is the level of concentration he needed to trade as he did, and which he would bring to bear at times for two days straight.

Knowing Nav, the analogy that comes to mind is of a soccer-obsessed 11-year-old joining a game, being fouled repeatedly, and after complaining without effect to an unmoved referee, enthusiastically dishing out what he is absorbing. He doesn't quit; he understands that *this* is the game they are playing, and plays it all the harder according to the new rules.

Given that at the time of the offense, in the words of the case agent, FBI Special Agent Greg LaBerta, spoofing was "prevalent," but no one had ever been prosecuted for it, Nav did not realize, trading in his childhood bedroom, that deciding to play the game in the way he observed carried unimaginable risks. And once he began to spoof, given his abilities—by that point he had already made millions trading without spoofing—he did it so effectively and obsessively as to eventually draw the attention of the authorities to whom he had previously and fruitlessly complained.

Nav is profoundly remorseful for what he did. Special Agent LaBerta described him as "punishing himself mentally;" that he had "crushed himself." Nav's fate is knowing that he unthinkingly hurt innocent victims, caused enormous pain to his family, and threw his life away for, essentially, nothing—to get the high score on what was, to him, nothing more than another video game (albeit a much more complicated, endlessly fascinating and compelling one).

Nav's savant abilities in that game, together with his natural makeup—from the first instant of the first meeting with the agents and prosecutors he has (over) eagerly and excitedly explained all he knows about the markets they are investigating and how his former opponents are cheating on them—resulted in cooperation that has been programmatically useful on a national scale.

He has easily cleared the hurdles to exceptional cooperation: being completely transparent and available; working hard and providing substantial assistance; and preparing for and testifying at a trial born of that assistance. But it is his ability to look at a screen of flashing numbers detailing

4

the trades of anonymous, super-sophisticated traders and robotic algorithms and see human-directed story lines playing out that sets him apart. "There he is again!  Did you see it?"  Nav would exclaim to the agents and prosecutors as he explained the ways the individuals he saw in the numbers were cheating.  This ability to observe numbers changing from microsecond to microsecond and see people engaged in criminal conduct has helped open new avenues of enforcement.  And his cooperation is not over.  It continues for both DOJ and for the CFTC (including at an upcoming trial), and for as long as law enforcement continues to ask about what he sees, he will happily help, endlessly eager to explain it all.

Since his arrest, Nav has lived in terror of repeating his incarceration.  He is acutely sensitive to light and sound, and cannot bear social environments.  Dr. Baron-Cohen deemed him a severe suicide risk if incarcerated again, and after 96 hours without sleep, lying in Chicago's Metropolitan Correctional Center (MCC) on the nights preceding his plea, Nav began having thoughts of harming himself in order to escape the torture of his environment.  During his four months incarceration in the U.K., he deteriorated significantly on the one or so hours of sleep he managed each day, day after day, night after night, month after month.  (Being tired does not allow Nav to put his sensory hyper-sensitivity to the side and just sleep; as noted above, he can never turn off his condition.)  In the U.S., where Bureau of Prisons policy dictates that he must be housed in a low security facility rather than a camp due to his status as a non-U.S. citizen, the conditions which aggravate his sensory hyper-sensitivity will be all the more severe and the danger to his safety all the more clear.

Nav poses no risk to society.  He lives with his elderly parents, who have cared for him for his entire life, plays with his nephews, eats his McDonalds, feeds the birds, plays and watches football, and tries to calm his perpetual unease about what he has done to his life by reading books

on spirituality.  He would never have done anything that he understood could risk jail time, and he will never again trust his own judgment.

Nav has also learned a big lesson, the largest part of which is that he must trust others to make judgments for him about areas in which he is deficient.  And his story, which has received enormous publicity, could not send a stronger, wider message of general deterrence—the conduct in which he engaged ends in a ruined, destitute life.

Navinder Sarao lives outside the reality those without his autism inhabit.  All who have come to know him through this case have become deeply sympathetic toward him, immediately perceiving his unique qualities and understanding over time how they contributed to his prosecution.  For Senior U.S. Probation Officer Alper, the Nav-is-unique lightbulb moment came when Nav's brother informed him that Nav had been difficult to reach because he had washed his smartphone with soap and water.  For Special Agent LaBerta, it was when the man he had been building the case against first sat down next to him on their flight to the U.S. following Nav's extradition and began excitedly asking him about being an FBI agent (and taking obvious pleasure in the ability to meet a real, live agent).  For Robert Zink, the Chief of the Department of Justice's Fraud Section, it came when initial debriefing sessions had to be stopped because Nav got too excited trying to relate the drama he saw taking place in the numbers flashing up and down on a years-old video he made of his own trading screen.  For me, it came when I discovered that he had spent less than two hours with the man he invested over $40 million with and saw no cause for worry when I asked why the man would pay him 11% interest compounded quarterly on a risk-free investment when a bank would provide a loan for less than half that.  (Instead, he assured me that the man (who, of course, stole the majority of Nav's fortune (two others stole the rest)) would immediately provide the £5 million necessary for Nav's bail because he was his friend—a "great

guy." Months and months later, he still could not comprehend that he had been lied to, his money stolen, and that the great guy who seemed to like him so much was in fact preying on him.)

Our goal in sentencing is to convey to Your Honor as fully as possible who Nav is and how it contributed to his ending up before you. If we can do this, we most respectfully submit that the only fitting sentence is one that does not entail further incarceration, a result that would not only be excessively harsh and dangerous given his response to it, but is unnecessary to meet the goals of sentencing.

## I.     TIME SERVED IS THE JUST SENTENCE

The parties and probation agree that time served is the right sentence. Application of the Section 3553(a) factors demonstrates why.

### A.     Nav's Personal History And Characteristics

Navinder Sarao is a 41-year-old resident of London's Hounslow section. *See* Presentence Investigation Report (PSR) at 3.[4] The youngest of three brothers born to observant Sikh parents, Nav grew up without much money—the family lived in public housing until he was three—but his parents worked hard and provided him and his brothers with a safe, secure, stable and loving home. He was a well-behaved, happy child who did well in school, particularly in mathematics, and enjoyed games of all kinds.

Nav has never been in trouble before, and lives the tightly circumscribed life detailed in the PSR and the letters from his friends and family. He spends the vast majority of his time— waking and sleeping—in the same 8'x 11.5' bedroom he has occupied since he was three. It

---

[4]  I have conferred with the government and the underlying facts are not in dispute. To ease the Court's review, I have not included factual citation (other than for quotes) for the many sentences that relate information conveyed in numerous places or combine information from multiple sources. Except where otherwise noted, the sources are: (i) the PSR, (ii) the letters to the Court from Nav's family and friends, Exs. B.1-27, (iii) Professor Baron-Cohen's letter to the Court, Ex. A, and (iv) my own observation of Nav and details I have learned about him during the course my representation of him.

contains a framed jersey of his hero, soccer star Lionel Messi, a bookcase with decades' worth of video games (primarily soccer), a bed upon which sits a stuffed tiger and other stuffed animals (which Nav notes that he keeps because they are beautiful, not because he needs them), and the desk upon which sits an Xbox he uses to play video games and the computer he used to use to trade. *See* photos of Nav's bedroom, taken without his knowledge following a first meeting with his father, who explained to me that I had to see Nav's bedroom to understand him, at Exhibit C.[5]

Nav's parents care for him, as they have his entire life, and as they will for the rest of theirs. *See* Nachhattar Singh Sarao (Father) Ltr., Ex. B.1, at 3 ("I love him dearly and will look after him for the rest of my life"). After that, as his brother Jasvinder puts it, "I currently have two children and when inevitably my parents pass on, I will have three." Jasvinder Sarao (Brother) Ltr., Ex. B.3, at 3. He explains:

> We all start life as innocent and inquisitive beings, as time goes on, due to numerous factors, we lose this quality, but Nav hasn't. Normally it would be advised for any 40 year old to leave the family nest and spread their wings in the big wide world. As to my knowledge, not a single [family] member has suggested Nav do this,

---

[5] The story of the Messi jersey, a gift from one of the men who defrauded him, bears mention. Nav invested £2.35 million in the man's supposed online gaming venture. The man claimed the money would allow him to obtain patents that he said were extremely valuable and would guarantee a quick 10 to 20 times return on Nav's investment. Approximately six months later, after spending Nav's money lavishly on himself, he invited Nav out, treated him in a friendly way, and presented him with the framed Messi jersey, which was signed "To Nav, Lionel Messi." Nav was impressed by the jersey, thinking it demonstrated superior connections in the sporting world. He also felt the man was his friend and could be trusted. Thus, when the man ended the evening by asking for an additional £1 million loan in order to exploit the patents he claimed to have acquired, Nav readily agreed to provide it. Soon after, the man stopped returning Nav's calls and messages. Approximately six months later, when we were trying to obtain funds for his bail, Nav explained his "investment" to me. After hearing my thoughts, he considered for the first time (very skeptically—the man was a friend) that the £3.35 million might be lost. Long after that, when it was clear the money was gone, he allowed himself to acknowledge that the portion of the writing on the jersey that says "To Nav" was written in an obviously different hand from Messi's signature, which he believes is genuine (signed jerseys can be purchased in memorabilia stores). In sum, Nav was swindled of £3.35 million, has a store-bought signed jersey with a fake inscription to him as a memento of the experience, and it is the only item that hangs on the wall of the bedroom where he spends nearly all his time. When asked why, he explains, "It's still a signed framed shirt off the best player in history. It's still a nice item, innit?"

and that is primarily due to the fact that it would be dangerous to persuade him to.

*Id.*[6]

When outside his bedroom, Nav's footprint is extraordinarily light—he stays in Hounslow and his day-to-day life is comprised of family. His parents are the two most significant people in his world, but he also frequently sees his nephews, aged 14 and 15, who live across the street. Multiple times a week, as he has throughout their childhoods, he plays with them, avidly competing in soccer, ping pong and badminton, as well as video, card and board games. Interspersed with the competition, Nav serves as a confidant, mentor and friend, teaching them not to lose their tempers (they have never seen him angry (nor has anyone else)), to forgive, to respect and care for animals (ranging down to ants, snails and spiders), and sharing with them the latest teachings in the spiritual books he consumes.

Next in Nav's world are his brothers Jasvinder and Rajvinder, and their wives Cila and Gurpreet, who see Nav multiple times a month, love him dearly, and write about him with parental concern. Outside of this group, Nav has a small collection of friends he see infrequently, most of whom he has known since grammar school, a small number of London-based aunts and uncles he also sees infrequently, and a large array of aunts, uncles and cousins in India whom he sees very rarely.

---

[6] This sentiment—that Nav needs to be cared for and cannot care for himself—is echoed in many of the letters provided to the Court. It is also in keeping with my experience. Nav is astonishingly gifted in certain ways, intelligent, thoughtful and inquisitive in many others, and blessed with a singular, beautiful makeup—he is innocent, friendly and unguarded in a way that does not begin to approach anyone I have encountered over the course of my life. But his lack of even a basic of understanding about how people work, and thus how the world works, leaves him too vulnerable to care for himself. And his lack of common sense and the obstacles posed by his obsessiveness, and the extremely narrow slice of concerns that obsess him, also make it impossible to imagine him performing the daily tasks of living without assistance.

It is notable that of all the letters submitted to the Court—with the exception of his mother and his nephews' mother, Gurpreet, who describe him joking with them playfully—the writers other than his nephews exclusively describe him, rather than their relationship with him. This squares with a fact noted in nearly every letter: that Nav prefers the company of children to adults. To children, he is a peer, and their relationship is active. In the rest of the letters, there is an outpouring of love, concern and appreciation, but it comes through the lens of observation, rather than the back and forth of a relationship. It is a telling fact about his autism, and how even with those he loves most and who love him most, he remains separated from them by it.

In addition to his preference for the company of children—and the joy he takes in it, including the oft-repeated story of him spending a joyful afternoon in a bouncy castle at a family party—those who know Nav best hit the same notes over and over in their letters:

- His dread of social situations and inability to overcome it;

- His inability to understand and conform to social norms, including the long list of events where his clothes were deeply inappropriate—from wearing army fatigues to a formal, traditional Indian wedding, to donning a traditional Indian kurta for his weekly neighbourhood soccer matches, to wearing pajama bottoms, visible under his pants, during the period he traded from an office;

- His inability to understand how his actions will affect others, including noting to his sister-in-law that his new niece looks like a "garbage pail kid" (and then producing his old collection of Garbage Pail Kid cards in support), failing to clean up a smashed bottle of cooking oil while his elderly mother was on crutches recovering from knee surgery (he instead instructed her to avoid the kitchen), and failing to appear to see family members who have travelled to see him;[7]

---

[7] This is another area in which I have vast experience, as Nav cannot perceive that other clients or a life outside work might make demands on my time, and that when he shows up late and then keeps me hours after a meeting's scheduled end, it affects me. But, to quote his U.K. solicitor, "Ultimately, however exasperated he, at times, made me feel, his affable, childlike manner together with the utter absence of any guile and the deep, unquestioning faith he placed in me meant it was difficult to sustain any annoyance with him, particularly as I came to understand that his many eccentricities were largely governed by his condition and were what make him so unique." Russel Nicholson Ltr., Ex. B.9, at 1. Or to quote his brother, "[being] annoyed with Nav . . . would be like being annoyed at my 2-year-old daughter for lifting up her skirt in public." Jasvinder Sarao (Brother) Ltr., Ex. B.3, at 3.

- His hyper-sensitivity to light, sound and touch, noted most often in discussing his need for absolute silence and darkness in order to sleep, but also in cutting up clothes to minimize the contact of waistbands or wearing the kurta to feel less constrained while playing soccer;

- His obsessiveness, from playing with a "Little Professor" toy so relentlessly as a toddler that he learned his times tables at three, to his training regimen when dreaming of becoming a professional athlete, to his trading for two-day stints in his bedroom without rest;

- His love of games and compulsion to be the best he could be, be it board games with his nephews, football with his friends, video games in his bedroom, or card games with elderly Indian relatives where he strictly enforces the rules;

- His treating trading like a video game, with an obsessive focus on winning and a total lack of interest in the money he earned;

- His utter and complete disregard for money and material possessions, which led many people in his life to conclude he must have a poor paying job since he worked so hard and had so little;[8]

- His keeping his wealth secret from all the people he cared about since he noticed that the very few people who knew how much money he had treated him differently;

- His lack of common sense, from washing his phone to applying a mud pack to his face with dirt from the garden to his failure to master simple tasks like driving or doing laundry;

- His extraordinary naivete, most notable in the complete lack of surprise expressed by the many who commented on all his money being stolen;[9]

---

[8] By way of confirmation: In preparation for his testimony, one of the prosecutors asked Nav to estimate on the safe side his yearly spending during the period he possessed tens of millions of dollars. After initially responding that it was less than £10,000 per year, he returned the next day to inform them that after thinking it over, it was actually half that amount.

[9] Nav made in excess of £45 million over the course of his trading career. Given exchange rates at the time of his arrest, this equated to approximately $70 million. Of this sum, at the time of his arrest, his liquid assets were approximately £4.8 million, all but around $100,000 of which was in his active trading account. The remainder of his money—approximately £40 million—had been placed into three "investments":

- IXE Asset Management AG, a purported commodities trading company. To secure Nav's investment, IXE's president promised to pay extraordinarily high interest (11% compounded quarterly), without placing Nav's principal at any risk whatsoever. (The investment documents detailed that Nav's money would secure letters of credit and would not be removed from a Swiss bank account without Nav's express approval.) Based on these assurances, Nav invested more than £25 million with IXE.

- His need for routine and the care of his parents;

- His utter inability to adjust to life in prison, including his inability to sleep, and the danger incarceration will pose to him;

- His devotion to animals, from a hurt buffalo that he cared for as a small boy in India, to the birds, ants, snails, rabbits and spiders of Hounslow he tried to care for and protect, to the unwanted dogs and cats he dreamed about using his fortune to provide a home for;

- His "see[ing] the world differently," living "in his own world," "in his own fantasy land," and "on a different wavelength." *See, respectively,* Letters of Cila Sarao, Ex. B.6 at 3; Navdeep Sarao, Ex. B.23 at 1, Saqib Rahman Ex. B.10 at 1

---

- Cranwood Holdings Limited, an Isle of Man entity that claimed it would develop a windfarm— i.e., numerous windmills on a number of sites—secured Nav's £11.5 million investment by claiming that it would quickly produce profits of between £250 and £400 million.

- Iconic Worldwide Gaming Limited, a company claiming it would produce a dynamic, video game-like interface that would allow bettors to place wagers in a more exciting way, obtained £2.35 million from Nav on promises of 10 to 20 times return. As noted above, Nav also later made the owner of the company a personal loan of £1 million.

Nav lost all this money. As to IXE, despite monthly statements reporting that his investment had quickly grown to in excess of £30 million, neither Nav (through efforts of counsel) nor the U.S. government were able to recover any of it. Instead, IXE provided a series of increasingly non-credible explanations as to why the funds could not be returned (for example, at one point IXE claimed Nav's money had been invested in unrefined Bolivian gold (in violation of the investment agreement) that, upon the lifting of an embargo by the Bolivian government, would be processed and sold). It has since been widely reported that IXE's founder is a con artist and IXE was a ponzi scheme. *E.g.* Ingo Malcher, *Bezahlt wurde noch nicht,* BRAND EINS (2016), https://www.brandeins.de/magazine/brand-eins-wirtschaftsmagazin/2016/gesundheit/bezahlt-wurde-noch-nicht.

Nav's Cranwood investment was spent on salaries for the CEO and a number of his family members (who possessed no relevant experience), without securing a single site on which it could build a windmill.

Similarly, the CEO of Iconic Worldwide Gaming spent lavishly on himself before the company went into liquidation.

Before putting £40 million into these three companies, Nav had never made an investment. That changed when his boss at the brokerage where Nav had started making large sums suggested that he "put his money to work," and introduced him to a money manager, who in turn introduced him to two supposed investment advisors. These men charged Nav in excess of £2 million in "finders fees" (which are normally paid by the company receiving the investment, not the investor) and commissions for securing Nav's investments in Cranwood, IXE and Iconic Worldwide Gaming.

With respect to Cranwood, which was Nav's first investment, his relationship with the two advisors soured when he discovered that they were charging him additional large monthly fees for the supposed use of their conference room for a Cranwood monthly meeting. Nav says that he understood at that point that they were using him, but he decided that they were good people and he could trust them again after they apologized, took him out to dinner, and they had a good time.

and Naranjan Chahal Ex. B.21 at 1 (all for "in his own world"); Daljit Sarao, Ex. B.2 at 1; and Saqib Rahman, Ex. B.10 at 1.

- His inflexibility, be it refusing to take off his shoes upon entering a home, insisting on giving money to "beggars" in India be they real or fake, including with funds collected from the floor of his brother's wedding (much to the horror of his family), or refusing to leave custody after finally making bail for hours until his solicitor could provide a favorite hooded sweat jacket;

- His never having a bad thing to say about anyone;

- His childlike, naïve, trusting, innocent, friendly, gentle nature.[10]

Since he stopped trading following his arrest, Nav's days consist primarily of searching for peace in spiritual books, watching soccer on TV, playing video games, playing with his nephews, playing in a weekly neighborhood soccer game, and attempting to make a living "spread betting."[11]

The inability to trade has been a blessing and a curse. Nav began trading out of university, was preternaturally good at it from the start, and after making a sufficient stake being paid a percentage of money he earned trading his employer's money, he began trading for himself from his bedroom. Trading was his obsession, and while he is glad to be free of the power it held over him, it was also a profession he was exceptionally good at, devoted himself to for 12 years, provided a uniquely compelling way to exercise his gifts, and gave him something to do that affirmed him.

---

[10] For years I have described this aspect of Nav to friends and family either by saying that he is like a very enthusiastic and sunny 10 year-old or that he possesses the best traits of a very friendly one-year-old puppy. I knew that the letters would all comment on his childlike qualities—it is bonk-you-on-the-head obvious upon spending any time with him—but I was amazed to see his sister-in-law Cila, the one person to name his autism prior to diagnosis, make the same comparison. I suspect her ability to get to really know Nav well, but her meeting him for the first time in his thirties, gave her the distance to not only be able to see his autism, but the perspective to see just how unique Nav is and that, in fact, there is no 10-year-old human as immediately and wholly trusting, guileless and enthusiastically friendly as Nav.

[11] As the Court is likely aware, gambling is legal in the U.K. Spread betting consists of placing bets on the direction of the market. Due to the large margins placed around such bets to ensure the gambling sites make money, the inability to effectively execute the split second intra-day decisions that distinguished Nav as a trader, and the tiny size of his bets, Nav's efforts to support himself this way have been, for the most part, futile.

In the time since, he has sporadically performed various volunteer and low level jobs, including the spread betting, but primarily he has struggled with coming to terms with the devastation he wreaked on his life and family,[12] and his overwhelming fear of returning to the torture of prison. His introspection has been a particularly difficult journey because it involves not only accepting responsibility for what he did, but also accepting for the first time that he is not just quirky, beloved Nav, who sees and does things differently, but a person whose differences do not come from choice, cannot be overcome, and played a central role in the poor decisions he made to find himself in the position he is in.

### 1. Nav's Autism[13]

Despite numerous evident traits throughout his childhood and adult life, Nav's autism was not diagnosed until after his arrest when, upon first interacting with him, his U.K. lawyers immediately suspected an organic condition affected their client.[14] Nearly every one of the letters

---

[12] This includes the effect of the massive media coverage his case received in the U.K. The Sarao's are religious, private people, and the media circus that surrounded them following his arrest took a significant toll, which contributes to Nav's feelings of guilt.

[13] I initially described Nav's condition to the court as "severe Asperger's syndrome." While I have confirmed with Professor Baron-Cohen that this was correct, I have used the term autism in this submission to be consistent with his expert report, submitted under seal at Exhibit A, which uses the current term "autism" to cover Autism Spectrum Disorders, including what was known as Asperger's syndrome.

[14] This was consistent with my experience. Within a few minutes of meeting Nav in London's Wandsworth prison (the city's MCC equivalent), I asked the U.K. lawyer who had started working with him a few days earlier to speak in the hall so I could find out if Nav suffered from some sort of mental condition. He stated that he and his partner had immediately suspected the same thing and had already started looking for someone to conduct testing. By the end of that initial meeting, I was sure that the testing would reveal something: everything about Nav's response to his situation, how he presented himself, what he wanted to focus on, his immediate blind faith in me, his fanciful ideas about solving the problem, his obvious command and intelligence when talking about trading paired with his investment in an blatant Ponzi scheme and his presentation as a very friendly 10 year-old, were radically unlike any other person I had ever come across.

from his family and friends detail a huge range of unusual behavior they had witnessed over the course of Nav's life that they say now makes sense in light of his diagnosis.[15]  The list includes:

- Physical expressions of autism such as:

    o    rhythmically rocking back and forth and banging his head against a chair as a child;

    o    walking on his tiptoes excessively as child;

    o    extreme sensitivity to light, sound and touch; and

    o    avoiding eye contact;

- Difficulty reading social cues and conforming to social norms as noted above;

- Discomfort and avoidance of social situations and preference for the company of children and animals;

- Narrow, obsessive interests and obsessional behavior;

- Inflexibility/difficulty adapting to change; and

- Savantism in mathematics/pattern recognition.

Not surprisingly, the above list closely mirrors that detailed by Professor Baron-Cohen in support of his autism diagnosis.  Given these behaviors, Nav's extraordinarily high Autism Spectrum Quotient score, his inability to live independently, and a level of "social naivete" that "led him to be easily exploited by others and to have such focused tunnel vision in his obsessional trading as to not see the risks to his own liberty," Professor Baron-Cohen labelled the effect of the autism on his life to be "severe".  Baron-Cohen Ltr., Ex. A, at 2.

Baron-Cohen noted that autism:

---

[15]  The failure of family and lifelong friends to diagnose autism spectrum disorders is not uncommon, and often explained by a desire for the loved one not to be burdened with a disorder. *See, e.g.*, Melissa Davey, *Why the World Expert on Asperger's took 30 Years to Notice Condition in His Own Son*, THE GUARDIAN (Sept. 25, 2017), https://amp.theguardian.com/society/2017/sep/25/why-the-world-expert-on-aspergers-took-30-years-to-notice-condition-in-his-own-son; Meng-Chuan Lai, Simon Baron-Cohen, *Identifying the Lost Generation of Adults with Autism Spectrum Conditions*, 2 LANCET PSYCHIATRY 1013 (2015).

- "is neurological (i.e., affecting brain structure and function), developmental (i.e., arises early and is lifelong), and partly genetic in origin;"

- "prevents the individual from being able to make friends or relationships easily, or reading cues in social situations, or understanding other people's behaviour or social conventions or expectations;"

- "prevents the individual from conforming to social norms and leaves the individual vulnerable to getting into trouble through social naivete or poor decision-making;"

- "typically means a person may not be fully aware of the consequences of their actions, or understand the consequences of their behaviour on others;"

- "causes clinically significant impairment in social, occupational and other important areas of functioning;" and

- "[b]ecause people with autism are also strongly obsessional, meaning that they pursue their current interest to extraordinary detail and lengths and in great depth, they can develop 'tunnel vision' that prevents them from seeing the bigger picture, including the repercussions of their current actions."

Baron-Cohen Ltr., Ex. A, at 2.

As noted above and detailed more fully below in the discussion of the nature and circumstances of the offense, these traits and characteristics—Nav's autism—played a central role in the offense conduct:

- His pattern recognition allowed him to:

  o see the illicit conduct of large players in the market and algorithmic trading robots in the anonymous trade orders and executions changing on his screen from microsecond to microsecond; and

  o reverse engineer what they were doing and do it himself.

- His strongly obsessional behavior and resulting "tunnel vision" combined with his social and communication difficulties, lack of understanding of societal norms, inability to understand other people's behavior and social conventions/expectations led him to:

  o Trade obsessively;

  o Engage in the same conduct he reported to the CME;

  o Do so with an intensity and at a volume that attracted the authorities;

16

- o  Create videotapes of himself committing the offense to document his adversaries' doing the same thing without considering he was also documenting his own wrongdoing;

- o  Not consider or understand the possible consequences of his actions despite his doing the same thing he complained to the CME was wrong and needed to be stopped;

- o  Be unable to make "a nuanced judgment about the differences between effective rules"—those he saw being broken by his adversaries—"and written rules, or that behaviour could be widely and obviously in use and still strictly prohibited;" Baron-Cohen Ltr., Ex. A, at 4.

- o  Engage in this conduct despite having no interest in the ultimate benefit of "winning" at the game he was playing—i.e., he didn't care about or do anything with the money; he just wanted to beat his opponents and win, as with any other video game.[16]

Nav's autism also drove Professor Baron-Cohen's opinion that if again incarcerated, his

suicide risk was "very high."[17]  I knew of this assessment heading into Nav's initial appearance,

---

[16]  Nav is also a world class video game player, breaking into the top 700 globally in the FIFA game series—the world's most popular video game (which can be played online against opponents around the globe).  It is a feat that shares much with his trading success—his single minded devotion to it, willingness to invest thousands and thousands of hours on it with total concentration, and his extraordinary manual dexterity and reaction speed. More importantly, it was an activity that occupied a similar place as trading in Nav's world—a competition to which he could devote himself fully and lose himself competing in.  The difference, according to Nav, is that trading the S&P 500 E-mini was "by far the world's best video game—it's not even close" due to the degree of difficulty, speed and level of complexity.

[17]  Probation reports that Nav has "never experienced suicidal ideations," and that imprisonment would "increase his likelihood of suicidal ideations."  PSR at 91; Sentencing Recommendation at 3.  Professor Baron-Cohen's report noted that Nav said he felt suicidal in Wandsworth and that he would commit suicide if incarcerated in the U.S.

Nav has never actively planned to take his own life.  At Wandsworth, he was "very, very low," questioning whether life was worth living and how long he could continue in jail.  PSR at 91.  His comments on prison in the U.S. reflected his understanding—since confirmed by his time at the MCC—that he did not think he would be able to withstand it.

That factor—Nav's ability to withstand prison—is what drives the risk.  As Professor Baron-Cohen explains, Nav's suicide risk stems from "the experience of incarceration for an autistic person who has sensory hyper-sensitivity, social aversion, clinically high levels of anxiety and depression, and a need for familiarity."  Baron-Cohen Ltr., Ex. A, at 4.  Put otherwise, as probation recognized, the suicide risk comes from his being subjected to the "torture" of prison, PSR at 91, and that the experience would return him to the place he was in during his last two nights at the MCC when he could not control his thoughts, which were telling him to do anything to stop the torture he was experiencing.

and after interacting with him extensively and watching him drastically deteriorate during his prior incarceration, I was extremely worried that he would not survive a failure to make bail. In just the (wholly sleepless) period he spent from the Saturday afternoon prior to his extradition on Sunday morning UK time to his release from the MCC the following Wednesday evening in Chicago, Nav fell apart. On the Tuesday, he reported that he was worried because he could not control his thoughts during the night at jail, which were to harm himself in hopes of being placed alone in a "suicide cell" to escape the torture of the sound, the light, and the people around him. As noted above, this squared with his experience in Wandsworth. When discussing that time, Nav immediately returns to the dark place he was in while there, but snaps out of it equally quickly and talks excitedly about the relief he felt during the days he spent in the "suicide cell"—solitary confinement—after being attacked by his cell mate.[18]

Nav's autism also factored into Professor Baron-Cohen's view that he poses a recidivism risk of "zero." Building off his prior conclusion that Nav's autism prevented him from understanding that his conduct could be strictly forbidden and yet widely practiced, and the fact that autistic people are known to follow rules because of their need for total clarity, he stated that Nav, "is an intelligent man who now understands how to avoid ending up in prison again." Baron-Cohen Ltr., Ex A, at 4. He concluded:

> Prison is not the appropriate punishment for a man with his severe disability, and prison would pose a risk to his survival . . . . Rather, he could benefit from guidance and mentoring on how to use his

---

[18] After being punched once by his cellmate, Nav offered to let himself be punched again, thinking the cell they were in was video monitored (despite never having seen a camera), and that it would ensure his cell mate would be blamed and removed, leaving Nav alone. Instead, he was the one sent to the "suicide cell"— a cell that differed from his prior one not only because he was alone, but because he had no window, kettle, TV or "bin" (trash can). He was also isolated from the rest of the cells, making it quieter. Nav was very happy with the cell, despite it typically being considered a form of punishment, and could not care less about the black eye he received as the price of admission.

remarkable pattern recognition skills to help the stock market regulatory authorities and for the benefit of society.[19]

*Id*.

**B.      The Nature And Circumstances Of The Offense**

Nav does not object to the description of the offense conduct set forth in the PSR, the Government's Version of the Offense, the indictment or plea agreement.[20]

As detailed above, the key points that place this offense far, far outside the heartland of fraud convictions are: (i) Nav did not commit the crime to make money and did not spend the money he made and (ii) the singular way Nav came to commit the crime and its impact on his moral culpability.

**1.      A Fraud That Was Not Committed for the Money**

There is no dispute that Nav did not commit this crime to get rich. With the exception of the ill-fated Volkswagen, he spent no more as a multimillionaire than he now does as a public

---

[19]  As noted above, Nav has already been providing such assistance.

[20]  For the sake of completeness, and without challenging the stipulated Guidelines calculation, it is worth noting the method by which the Government arrived at the estimated monetary gain from the offense.

Spoofing takes place on markets where prices are constantly moving in reaction to orders placed and trades executed by other market participants.  As such, it is impossible to precisely gauge the effect of a single spoofer's actions in any spoofing case.  Simply put, there is no way to unravel all the factors that go into creating the price of a given security and determine the impact of the spoof order upon it.  Because the S&P 500 E-mini Nav traded, which reflects the global financial community's view on the future strength of the U.S. economy (as reflected by the S&P 500 Index), is the world's most actively traded futures contract, the problem becomes all the more difficult.

To solve this problem and gauge the impact of the offense conduct, as in any spoofing case, the government necessarily had to make assumptions.  Here, the measure of Nav's gain from his spoofing assumed that from the moment Nav placed a spoof order until the moment he executed a trade that could have benefited from it, all price movement in the global market for S&P 500 E-mini futures was attributable to his spoof trade.  So, for example, if Nav placed a spoof order on the sell side in hopes of exerting downward pressure on the market (the "Spoof") and then, minutes later, made a purchase (the "Trade") at a price that was lower than the price when he placed the Spoof (i.e., the market moved in the direction he wanted it to), his gain for purposes of the Guidelines calculation was the difference between the two prices.  As mentioned earlier, due to the extraordinary volume of market activity, the price of the S&P 500 E-mini futures Nav traded fluctuated from microsecond to microsecond, and these changes continued to take place during the periods between each Spoof and Trade measured.

benefits recipient. And he was not saving for the future; his plans to create a home for unwanted pets, buy a soccer team, or treat cataracts throughout India were fuzzy, distant fantasies. He made money—both the tens of millions earned legitimately and the profits derived from the offense conduct—as a byproduct of his furiously competing in an activity in which that was the measure of success.

We were unable to find precedents for a fraud in which the defendant did not seek to obtain money for one reason or another, or to do anything with it. Numerous cases show courts treating defendants more leniently where they did not personally reap the rewards of the fraud. *E.g. United States v. Roth*, No. 05 CR 792-5, 2008 WL 686783, at *2 (N.D. Ill. Mar. 11, 2008) (imposing a below guidelines sentence of probation where defendant would have received no benefit from the scheme); *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) (imposing below guidelines sentence where defendant did not profit from offense). But we believe this to be the only case where the acquisition of money was irrelevant to the defendant's motivation. It is a singular fact, placing this case so far outside the heartland of fraud convictions that their relevance appears to lie solely in the effects of the fraud on the victims of the offense.[21]

It is also notable that since Nav did not commit the offense to obtain money and did not spend any of the money he earned, but for being defrauded, he would have been able to pay the

---

[21] In that regard, for very different reasons, the case is also outside the heartland. The overwhelming majority of the victims of Nav's spoofs were extremely sophisticated market participants, a number of whom were spoofing themselves. (By the same token, Nav is not only a spoofer; he was a victim of others' spoofs thousands of times over.) Further, if successful, his spoofs would affect the price of a futures contract that typically traded between $1,000 and $2,000 by a "quarter-tick" (25 cents) or two (50 cents). This meant Nav's activity, when successful, distorted the price of a contract by anywhere from approximately .01% to .05%. This fact in no way excuses his conduct. It is included for the sake of completeness, and to note that the gains from the offense do not come from detectable losses by small investors, but by very small losses to sophisticated ones that added up over time (per the estimate detailed at n. 20, *supra*) given the volume and duration of Nav's conduct.

full restitution many times over. As it was, he turned over to the government all the money he had left.

### 2. A Crime Committed With The Requisite Intent, But Without Moral Culpability

In keeping with Nav not committing the crime in order to make, have or use money, Nav did not decide to knowingly commit a crime in order to get something he wanted. He did not know his conduct was criminal, decide to do it anyway, and live with the consequences if he got caught.

There is no doubt Nav is guilty: he intentionally performed all the conduct that makes out the elements of the crimes of conviction, including trying to trick the market participants he was competing against with his spoof trades. There is also no doubt that he knew spoofing was wrong: it is clearly documented by his complaints to the CME. And he is deeply remorseful for his conduct. This is partly because of the pain it has caused him and his family, but also for its effects on his blameless victims—the market participants he never considered as he obsessively waged his fight-fire-with-fire war against large players he saw cheating in the market.

But there is a critical way in which the way manner in which Nav came to and committed the crime create a distinction between his criminal culpability and the moral culpability that is an important driver of sentencing. *See, e.g., Graham v. Florida*, 560 U.S. 48, 71 (2010) ("[A] criminal sentence must be directly related to the personal culpability of the criminal offender."); *see also Abdul-Kabir v. Quarterman*, 550 U.S. 233, 251-53 (2007) ("[T]he sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime.") (emphasis in original).

To begin, as noted by Special Agent LaBerta, when Nav begain spoofing, the conduct was "prevalent" in the market. PSR ¶ 46. To combat it, 18 months after Nav began spoofing, Congress created the crime of spoofing as part of the Dodd-Frank Wall Street Reform and Consumer

Protection Act. Pub. L. No. 111-203, § 929-Z, 124 Stat. 1376, 1871 (2010) (codified at 15 U.S.C. § 78o). More than four years after that, the Department of Justice brought its first spoofing prosecution. *See* U.S. Attorney's Office, *High-Frequency Trader Indicted For Manipulating Commodities Futures Markets In First Federal Prosecution For "Spoofing"*, https://www.justice.gov/usao-ndil/pr/high-frequency-trader-indicted-manipulating-commodities-futures-markets-first-federal (Oct. 2, 2014). Six months after that, on April 21, 2015, Nav became the second person ever charged with the crime. *See* PSR at 1.[22]

In summary, in the period leading up to Nav starting to spoof in early 2009, Dodd-Frank was nearly two years away, the first spoofing prosecution was nearly six years away, and Nav could observe competitors routinely spoofing while he was trading. When one particularly large and effective spoofer started significantly hurting Nav's trading,[23] Nav began complaining about it to the CME's Market Regulation team via (frequent) calls and emails. He would identify the fraudulent sequences he observed by time, price and order size—the same information he would provide to the government nearly a decade later as part of his cooperation. Weeks later, when calling back to complain some more, he would be told that the CME had looked at the sequence or sequences he had previously identified and did not see anything wrong. This process repeated itself over and over again for months, with Nav calling once or twice a week. Nav could not

---

[22] Market manipulation, securities, commodities and wire fraud were, of course, illegal prior to the passage of Dodd-Frank, but no one was ever prosecuted for the conduct of spoofing the markets via any of those statutes prior the prosecution of Michael Coscia in October 2014.

[23] There was, of course, no way for Nav to actually know for certain which of the anonymized orders that flashed on his screen from microsecond to microsecond belonged to which trader. In the numbers, however, he saw a clear individual nemesis at work. When Nav reviewed the videos of his trading with the government as part of his cooperation, he identified the instances where he saw this person engaging in spoofing and other forms of market manipulation. When the government obtained the data from the CME, they discovered that Nav was almost always right—the trades had been placed by a single person as Nav had discerned.

understand how they could say that what he was seeing happen every day, day after day, was not a problem.[24]  When he did not accept their explanations and kept calling, the people at the CME eventually became antagonistic, asking him why he kept saying the same thing over and over, and even hanging up the phone on him on multiple occasions.  Nav, too, became upset.  He had spent months and months reporting the conduct to no avail, and he determined that if they would not help him, he would have to help himself.

It is against this backdrop that Nav began using the spoofing techniques that had been used against him or, where required, started developing the tools necessary to effectively copy them. Not only was spoofing not prosecuted conduct at the time, but Nav had been told repeatedly by the regulators that they did not see anything wrong with the spoofing sequences he identified to them.  He understood it was wrong—that's why he was complaining—but he in no way thought he was embarking on an activity that might land him in jail.  And given his autism, as Professor Baron-Cohen explains, there was no way he could discern the difference between the formal rules and the effective ones governing what he saw in the market—i.e., making the connection that this non-prosecuted, obviously occurring activity that the CME was aware of and did not see anything wrong with, was actually strictly forbidden.

Nav's autism also played a role in the years that followed.  Once he decided he needed to spoof to compete, it became a routine and equally obsessive part of his trading.  And as he developed the tools that allowed him to do what he saw others doing, he used them without limitation, engaging in the significant volume of spoofing set forth in the government's statement of the offense.  Despite committing the very conduct he complained so bitterly about, his obsession

---

[24] Nav does remember one instance that conflicts with this in which someone from the CME said to him that it did look like he was "being gamed"—an expression he remembers because he had ever heard it in England.  The CME, however, took no action.

was such that he never picked his head up, took stock, and contemplated the risks that he was taking. He simply continued to play his game with laser focus, trying to beat his high score.

This story makes out the crime that Nav pled guilty to and is guilty of committing. But given his autism, it is also a story of blameless determinism—i.e., if you dropped Nav into the S&P 500 E-mini futures market 100 times at the same point in its regulatory development, he would have followed the same course each and every time based on how he was made. Nav never decided to commit a crime and risk jail time through his conduct. He never would have. He is thus not only a man who committed a fraud and did not do it to acquire money, he is a man who committed a crime without ever choosing to do so. That is a fact that bears heavily on his moral culpability and argues forcefully that no further punishment is necessary.

**C.**     **A Sentence of Time Served Satisfies the Goals of Punishment and Deterrence**

    **1.**     **Nav Has Been Punished Severely**

Nav has already been punished severely for the offense:

- He is an autistic man, extremely sensitive to light, sounds and social situations who served four months in a shared cell in the cramped Victorian-era prison that serves as London's MCC equivalent, a torture of sensory stimulation, sleep deprivation and forced socialization that was unbearable to him. It informed Prof. Baron-Cohen's conclusion that Nav posed a "very high" suicide risk if again incarcerated, and it remains a period Nav cannot discuss without experiencing evident pain.[25]

---

[25] Not surprisingly, consistent with Section 3553(a)'s focus on tailoring sentences to individual defendants, courts consider defendants' subjective experiences of incarceration in determining just punishment. *United States v. D.W.*, 198 F. Supp. 3d 18, 136 (E.D.N.Y. 2016) ("Vulnerable individuals may experience particularly oppressive conditions in prison, and [] this bears on the propriety of the sentence imposed."); *United States v. Gonzalez*, 945 F.2d 525, 527 (2d Cir. 1991) ("prison conditions may be particularly oppressive to vulnerable individuals"); *United States v. Musgrave*, 647 F. App'x. 529, 538 (6th Cir. 2016) (affirming district court sentence of one day of imprisonment considering, among other things, the inability of the prison system to adequately care for the defendant's medical condition); *United States v. Lawrence*, 254 F.Supp.3d 441, 453 (E.D.N.Y. 2017) (approving significant downward departure from guidelines sentence where defendant's existing mental illness would likely lead to self harm given a prior "attempted suicide while incarcerated and . . . extreme distress when he [was] away from his family for extended periods of time.").

- He an intensely private person who repeatedly waded through mobs of photographers outside court, had dozens of journalists camped outside his home, and saw intimate details of life—including many of the stories contained in this submission that he views as embarrassing—splashed across the newspapers.

- He is an inflexible person who cannot bear change or uncertainty (in anything but trading), cannot adjust to new situations, and has lived for more than four years in a state of suspended animation and abject fear of returning to prison.

- He is a son and brother and uncle who lives with the knowledge that but for the mistakes that led to the loss of his fortune—both his being defrauded and committing this crime—he would be able to make an enormous difference to the lives of those he loves (something that never occurred to him at the time, when he was focused solely on that they might view him differently since that happened with is accountant and the few other traders who knew).

- He is someone who was proud of himself and had a career in which he invested himself fully, and who is now ashamed and riddled with remorse.[26]

Finally, as noted above, he is struggling to learn how to come to terms with how an organic part of who he is, that he cannot control or fix, created deficits in him that played a large factor in him destroying his own life. This is a punishment that will never end.

### 2. Deterrence

#### a. Nav Poses No Risk of Recidivism

Professor Baron-Cohen's assessment that Nav's risk of recidivism is "zero" is simple: After not being able to discern that the conduct he engaged in was "truly illegal" based on it being widely used and known to the regulator (through his own actions), yet unpunished, now that Nav understands that it is strictly forbidden and leads to jail, he "is an intelligent man who now understands how to avoid ending up in prison again." Baron-Cohen Ltr., Ex. A, at 4. Given Nav's

---

[26] Courts appropriately recognize shame and humiliation as punishment. *See, e.g.*, *United States v. Warner*, 792 F.3d 847, 860-62 (7th Cir. 2015) (upholding probationary sentence because the payment of penalty to government agency and attendant collateral consequences of conviction, including shame, humiliation, and professional damage, sent a sufficiently strong deterrent message); *United States v. Roth*, No. 05 CR 792-5, 2008 WL 686783, at *3 (N.D. Ill. Mar. 11, 2008) (finding that the "publicity regarding [defendant's] conduct has obviously caused her great embarrassment and humiliation" and the loss of her "law license as a result of this case" militated in favor of probation).

response to incarceration and his fear of it, Professor Baron-Cohen's risk assessment is doubtlessly true.

Moreover, since there is nothing to suggest that Nav would have knowingly committed a crime had he understood that is what he was doing, there is no reason to believe he would now, for the first time, actively choose to begin a life of crime. He poses absolutely no risk to the public.

Finally, it is worth noting that, not surprisingly, Nav has not had a single incident in the four and one half years he has been under court supervision. Since his release from Wandsworth on August 14, 2015, Nav's conditions of release have required he be home between the hours of 11 p.m. and 4 a.m., that he not travel outside the M-25 (a ring road surrounding London) and that he not commit any further crime, use drugs at all or alcohol excessively, communicate with Jitesh Thakkar, possess any weapon, or trade in any U.S. securities, commodities, futures, or other financial instruments. It is the least surprising fact in this submission that Nav has followed these rules religiously. Prof. Baron-Cohen's statement that "autistic people are known to follow rules because of their need for total clarity" describes Nav to a tee, and he and those around him, will make sure he never has the opportunity to make a similar error due to the lack of such clarity.

### b. Nav's Prosecution Has Provided Enormous General Deterrence

Further jail time, and the extreme punishment and danger it poses to Nav are not necessary to send a strong message of general deterrence.

Much to his horror, Nav's case has drawn *enormous* media attention. His story is common knowledge to readers of general newspapers in the U.K., and well-known within the financial industry worldwide.[27] The lessons could not be more clear: spoofing is illegal; spoofers will be

---

[27] It is nearly impossible to find anyone in England who does not know the story about the "poor bloke with Aspergers" who made a fortune trading from his Hounslow bedroom, had it stolen, and then got

prosecuted; and such a prosecution leads to time in jail, penury, and the end of one's career. Indeed, given the ubiquity of the story and the clarity of the message, if it had happened to someone else first, it is a certainty Nav would have known the risks he was taking by spoofing and would not be before Your Honor for sentencing.

### c. A Sentence of Time Served Will Best Provide Nav with the Care He Needs

Section 3553(a)(2)(D) provides that the court "shall consider the need for the sentence imposed to provide the defendant with the needed educational or vocational training, medical care, or other corrective treatment in the most effective manner." In this case, Nav should be cared for by his mother and father. He will also be able to finally attend the free therapy he sought following his release from Wandsworth, but which was denied due to the pendency of this case. PSR at ¶ 96.

The suggestion that Nav would be adequately cared for in a BOP Care Level 3 facility, possibly with a "companion," has two fatal flaws. First, it assumes Nav will be designated to a Care Level 3 facility, which according to BOP expert Joel Sickler, is "highly unlikely."[28] Moreover, even if Mr. Sickler near 40 years' experience proves wrong, a Care Level 3 facility still

---

prosecuted in America. In the financial services industry, the story is so well known that he is no longer that "poor bloke"—he is typically known by name.

[28] Mr. Sickler explains:

> The definition of a MCL 3 inmate, in short, is an inmate who is a "fragile outpatient in need of frequent clinical contacts to avoid hospitalization." Ordinarily, the [Bureau of Prisons Office of Medical Designations] does not consider inmates on the Autism Spectrum Disorders (especially those with Asperger's Syndrome) to require MCL 3 status. I have worked with many inmates with autism. Not one of those inmates were assigned to an MCL 3 facility. . . .

> In my experience, inmates classified at MCL 3 require far more medical care and related oversight than your client. Most are elderly inmates suffering from severe heart disease, renal failure, cancer and similar illnesses. Asperger's inmates can perform their Activities of Daily Living (ADL) and are generally not on any specialized medications.

Sickler Ltr., Ex. D, at 2.

could not provide the tomb-like darkness and silence necessary for the sentence not to become another experiment on Nav's capacity to survive the sensory stimulation and sleep deprivation.[29]

### D. The Kinds of Sentences Available

#### 1. Incarceration in a U.S. Low Security Prison Would Be Dangerously Harsh

Inviolable Bureau of Prisons policy requires all non-U.S. citizens to serve any sentence in a low, medium or high security facility. *See* BOP Program Statement 5100.08 at 50 ("A male or female inmate who is not a citizen of the United States . . . shall be housed in at least a Low security level institution."). Federal prison camps ("FPCs"), to which an offender like Nav would otherwise go, are unavailable. This means that Nav would do much harder time than a U.S. citizen convicted of the same crime:

- Whereas FPCs are fenceless, low security prisons are surrounded by two perimeter barriers, each reinforced by multiple coils of razor wire, gun towers, and armed patrols. Inside, low security prisons employ extensive video surveillance and tightly control inmates' lives through, among other things, a minimum of five daily "counts" (including a count during the middle of the night), random pat-downs, and strip-searches whenever they are removed from the facility for a visit or health appointment. These prisons also frequently undergo unpredictably long "lockdown" periods during which inmates are confined to quarters and denied recreation, visitation, and telephone calls.

- Compared with FPCs that typically house 100 to 400 inmates, low security prisons usually have between 1,200 and 1,500 (and often exceed their designed maximum capacity). **The overcrowding in low security prisons is extremely stressful for inmates and noise is constant.** The size of these institutions and the ratio of staff to inmates virtually guarantee unsafe and unsanitary conditions (leading to widespread infectious diseases and violence). A 2014 report by the U.S. Government Accountability Office predicted, for example, that by 2018 federal prisons would be 45% overcapacity and warned that such conditions would "lead to rising rates of violence among prisoners." *See* GAO, "Bureau of Prisons:

---

[29] On the occasions Nav has traveled to the U.S. to assist the prosecutors, he has stayed in hotels and his experience has been similar to when he was in Wandsworth, managing no more than an hour a night. As such, on each occasion, after a few days, Nav begins to deteriorate noticeably. Even if he were able to achieve the same sleep at a Care Level 3 facility—a best case scenario—he would return to the state he was in at Wandsworth, when Prof. Baron-Cohen deemed him a very high suicide risk.

Growing Inmate Crowding Negatively Affects Inmates, Staff, and Infrastructure," Sept. 2014.

*See United States v. Conti*, 14-cr-00272 (S.D.N.Y.), Sent'g Mem., ECF No. 229 at 21.[30]

Not only will the physical conditions in a low security facility be extraordinary punishment for Nav to endure, but given who he is and his status as a known cooperator, he will be at risk from the other prisoners. Many inmates at low security prisons are serving lengthy sentences of 10 years or more, have convictions for violent crimes, are affiliated with gangs, and otherwise have a much higher propensity for violence against other inmates. *See id.* at 22-23. These inmates (all inmates) will know that Nav is a cooperating witness—a Google search of his name returns a close-up of his face and a title blaring that he is "In Chicago, On the Witness Stand for the Feds." That fact will make him a target for violence, and given Nav's makeup, he would be utterly helpless in protecting and defending himself.

Prison in the U.S. would also be excessively punishing for Nav because he would receive no visitors. Despite their extraordinary concern for him, none of his family members can afford to attend sentencing. The same will hold true if were incarcerated in the U.S.—a significant amplification of punishment for a man whose small world consists nearly exclusively of family, and who is cared for daily by his parents.

Finally, it is worth briefly noting that after completion of any further period of incarceration, Immigration and Customs Enforcement (ICE) will be required to immediately move him to an ICE detention facility where he will be forced to await deportation back to the U.K. *See* 8 U.S.C. § 1226(c) (requiring detention of criminal alien upon completion of prison sentence); *United States v. Takkas*, 15-cr-00252 (E.D.N.Y.), Sent'g Mem., ECF No. 730 at 13 (noting DOJ's

---

[30] The Sentencing Memorandum in *Conti* (involving another defendant from the U.K.) citing evidence from Joel Sickler. *See also,* Sickler Ltr., Ex D at 2.

confirmation that foreign defendant "will be quickly bundled into custody by ICE agents [following prison term] and locked up until he is deported"); *United States v. Ramirez-Ramirez*, 365 F. Supp. 2d 728, 732-733 (E.D. Va. 2005) (post-sentence immigration detention generally "mean[s] a further term of detention until his removal has been completed"). Although Nav would not challenge his removal, deportation can involve long delays, s*ee, e.g., Handa v. Clark*, 401 F.3d 1129, 1132 (9th Cir. 2015) (noting that five weeks transpired between arrest by ICE for visa overstay and removal to the U.K.); *see also* Sickler Ltr., Ex D at 5 (detailing the reasons for typical delays of weeks if not months in ICE detention following sentence expiration date). The conditions in ICE detention facilities can also be worse than the prison.[31]

### 2. Other Types of Punishment Are Available

#### a. Home Confinement

As an alternative to incarceration, the Court may of course impose home confinement as a condition of Nav's release. Such a sentence would impose further punishment while sparing Nav from prison in the U.S. and allowing him to be cared for by his parents. Courts impose sentences of home confinement where defendants do not reside in the U.S., *see, e.g.* Brief in Support of Defendant's Motion for Approval for Limited Travel Outside Canada, *United States v. Kristjan Thorkelson,* CR-14-27-BU-DLC-7 (Mont. June 28, 2019) (seeking temporary relief from home confinement in Canada to fly to Greece), and given Nav's track record of strictly adhering to his

---

[31] A 2008 study by the ACLU of Massachusetts found, for example, extreme overcrowding of up to *400% capacity* (forcing detainees to sleep on mattresses in converted gymnasiums), inadequate access to toilets and showers, inedible food, unsanitary water, abuse by guards, no recreation, and the mixing of violent and mentally ill detainees with the general population. *See* "Detention and Deportation in the Age of ICE," ACLU (2008), https://aclum.org/wp-content/uploads/2015/ 06/reports-detention-and-deportation-in-the-age-of-ice.pdf. Recent media reports suggest that conditions in ICE detention have not improved. *See, e.g.*, Rory Carroll, *Immigration Detention Centers Marred by "Needless Deaths,"* THE GUARDIAN (May 8, 2017), https://www.theguardian.com/us-news/2017/may/08/immigrant-detention-centers-medical-care-deaths.

U.K. and U.S. conditions of release for the last four plus years, the Court can be confident that he would similarly comply with a home confinement condition.  Further, to the extent the Court deemed it necessary, a term of home confinement could be monitored telephonically.[32]

### b. Community Service

A sentence of community service would also provide an avenue for additional punishment that could also be easily monitored by probation regardless of where it takes place.  Should the Court wish to pursue this option, we will identify charitable organizations near Nav's home that will take him as a volunteer for the requisite number of hours.

### E. The Sentencing Guidelines Range Should Be Disregarded

Courts must <u>not</u> presume a Guidelines sentence is reasonable, but rather "make an individualized assessment based on the facts presented."  *See id.*; *see also Pepper v. United States*, 562 U.S. 476, 488 (2011) ("courts must ensure that the punishment will suit not merely the offense but the individual defendant") (citation omitted).

Here, the parties not only agree on the calculation set forth in Nav's plea agreement to arrive at the Guidelines range, they also agree, along with probation, that the range produced is inconsistent with just punishment given Nav's cooperation and the Section 3553(a) factors.  In such circumstances, it is perfectly appropriate for these factors to drive sentencing.  *See Rita v. United States*, 551 U.S. 338, 351 (2007) (district courts may find that the Guidelines fail to "properly reflect the § 3553(a) considerations" or that "the case warrants a different sentence regardless"); *United States v. Whigham*, 754 F. Supp. 2d 239, 252 (D. Mass. 2010) (below Guideline sentence required where the range is greater than necessary); *United States v. Parris*, 573 F. Supp. 2d 744,

---

[32] If it is not possible for the U.S. Probation Department to place overseas phone calls, Dechert LLP can arrange for a U.S.-based telephone number to be programmed to automatically link with Nav's home telephone.  Nav's probation officer could then ensure that Nav complies with a term of home confinement by calling this number at random times.

751 (E.D.N.Y. 2008) ("it is difficult for a sentencing judge to place much stock in a guidelines range that does not provide realistic guidance").

It also worth noting that in cases with large loss amounts such as this one, courts recognize that the Guidelines operate to skew sentences upward without underlying justification in the goals that drive sentencing. Nav's estimated gain as a measure of loss accounts for 20 of the 28 total offense levels. *See* Plea Agreement, ECF No. 62. This use of loss amounts as the most heavily-weighted variable in determining fraud sentences is "unusual" and "unknown to other sentencing systems," s*ee United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016), and the Sentencing Commission has never explained its "inordinate emphasis" or "why it is appropriate to accord such huge weight to [this] factor." *See United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006). For this reason, district courts are permitted "to consider whether the significant effect of the loss enhancement . . . should result in a non-Guidelines sentence." *Algahaim*, 842 F.3d at 800; *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (a decision to issue a non-Guidelines sentence may "be based solely on policy considerations, including disagreements with the Guidelines").

Following this guidance, courts routinely criticize Section 2B1.1 for producing irrationally long sentencing ranges. In one particularly forceful recent instance, Judge Garaufis of the Eastern District of New York declared:

> As far as this Court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can fit the crime, nor any approximation of the moral seriousness of the crime. . . . Given the feeble underpinnings of the loss enhancement, it is particularly galling that this factor is often more or less *solely* responsible for a white-collar offender's Guidelines sentence. . . . That this situation continues unabated is a great shame for the many offenders sentenced under this Guideline who do not receive a sentence that makes any sense for the actual crime of conviction.

*United States v. Johnson*, No. 16-CR-547-1 (NGG), 2018 WL 1997975, at *3-*4 (E.D.N.Y. Apr. 27, 2018) (emphasis in original); *see also United States v. Watt*, 707 F. Supp. 2d 149, 151 (D. Mass. 2010) (undue focus on loss amount renders Guidelines of "no help").

Numerous judges and commentators have likewise observed that the unjustified impact of Section 2B1.1 is even more pronounced in cases, like this one, that involve high loss amounts. *See, e.g.*, *United States v. Corsey*, 723 F.3d 366, 378-79 & 380 (2nd Cir. 2013) (Underhill, J., concurring) ("the loss guideline is fundamentally flawed, especially as loss amounts climb . . . [and] [t]he widespread perception that [it] is broken leaves district judges without meaningful guidance in high-loss cases. . . . The higher the loss amount, the more distorted is the guideline's advice to sentencing judges."); *Faibish*, 12-cr-265 (E.D.N.Y.), Sent'g Tr., Mar. 10, 2016, ECF No. 271 at 23:1-12 ("[T]he guidelines . . . are just mindlessly accelerated once you have numbers of any size added in the loss or gain table."); Frank O. Bowman, III, *Sentencing High-Loss Corporate Frauds After* Booker, 20 FED. SENT'G REP. 167, 168 (2008) (for defendants "convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines are now divorced from both the objectives of Section 3553(a) and, frankly, common sense").

Where, as here, application of the loss enhancement generates a Guidelines sentence that does not approach a just result, the Court's sentencing determination should be guided almost exclusively by consideration of the factors set forth in 18 U.S.C. § 3553. *See, e.g., Adelson*, 441 F. Supp. 2d at 515 (where Guidelines calculation produces an overly long sentencing range, "a Court is forced to place greater reliance on the more general considerations set forth in Section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences."). As detailed herein, application of those factors, together with Nav's cooperation, call for a sentence of time served.

F.   **A Sentence of Time Served Will Not Create Unwarranted Sentencing Disparities**

As noted above in discussing the inability to find precedents for fraud cases where the defendant does not seek to acquire money, the facts of this case are so unusual that the sentence will have no precedential effect going forward.   Similarly, Nav's sentence cannot create unwarranted disparities with the sentences of similar defendants who have been found guilty of similar conduct because neither category exists—the case, and Nav, are utterly unique.  *See, e.g., United States v. Desmond*, No. 05 CR 792-F, 2008 WL 686779, at *3 n.2 (N.D. Ill. Mar. 11, 2008) (noting that sentencing disparity considerations were inapplicable considering the particular situation of the defendant was "so unique that few other cases are likely to be relevant for purposes of comparison"); *United States v. Roth*, No. 05 CR 792-5, 2008 WL 686783, at *3 n.2 (N.D. Ill. Mar. 11, 2008) (same);  *United States v. Villazan*, No. 05 CR 792-1, 2008 WL 686781, at *2 n.1 (N.D. Ill. Mar. 11, 2008) (same); *cf. United States v. Moreno-Garcia*, 551 F. App'x 387 (9th Cir. 2014) (finding no plain error where district court considered and dismissed defendant's sentencing disparity arguments as his own situation was "unique"); *United States v. Sheppard*, 612 F.Supp. 194, 199 (S.D. Va. 1985) (dismissing defendant's sentencing disparity arguments because the case to which defendant cited to make his argument was "unique" and thus incomparable).

## CONCLUSION

For the reasons set forth herein, we respectfully ask that the Court impose a sentence of time served and return Nav to the care of his family.

Dated: January 14, 2020

Respectfully submitted,

s/ Roger A. Burlingame

Roger A. Burlingame
Dechert LLP
160 Queen Victoria Street
London EC4V 4QQ
United Kingdom
Phone: +44 20 7184 7487
roger.burlingame@dechert.com


*Attorney for Defendant*

<u>CERTIFICATE OF SERVICE</u>

I, Roger A. Burlingame, hereby certify that on January 14, 2020, the foregoing was

electronically filed via the Court's CM/ECF system and served to all registered attorneys of

record via e-mail.

Dated: January 14, 2020

<div align="center" style="margin-left:40%">
s/ Roger A. Burlingame <br>
Roger A. Burlingame
</div>