# EXHIBIT D



Joel A. Sickler
Founder

**CONFIDENTIAL**

**January 14, 2020**

Roger A. Burlingame
Dechert LLP
160 Queen Victoria Street
London, UK EC4V 4QQ

RE: Navinder Singh Sarao

Mr. Burlingame:

You have asked me to briefly assess conditions of confinement, post-sentencing, and post sentence immigration confinement your client be committed to the custody of the federal Bureau of Prisons (BOP) and the US Department of Homeland Security's Immigration and Customs Enforcement (ICE) agency.

I have worked in the field of sentencing and corrections for nearly 40 years and currently head the Justice Advocacy Group, LLC, a criminal justice consulting firm based in Alexandria, Virginia. I have worked consistently since 1980 on federal sentencing and federal prison-related matters and have experience as a correctional counselor in the District of Columbia's Department of Corrections and with prior tenure as Director of Client Services at the National Center on Institutions & Alternatives in Washington, DC.

I have visited 51 federal prisons and have advised clients with inmate matters in 86 of the BOP's 122 institutions. Prior to the abolishment of parole, I represented hundreds of federal inmates before the U.S. Parole Commission. Based on more than three decades of experience assisting clients who have been committed to the care and custody of the BOP, I have extensive knowledge of the BOP and its stated mission, services, policies, program statements, regulations, institutions, and standard practices. In addition, I have represented multiple foreign nationals, such as your client, in post-BOP confinement issues with ICE.

I have reviewed and am thoroughly familiar with the following Program Statement of the Federal Bureau of Prisons: *Inmate Security Designation & Custody Classification* (P.S. 5100.08, September 12, 2006. I have spoken on numerous occasions with personnel at the Bureau's Designation and Sentence Computation Center ("DSCC")[1] and regional and central office officials

---

[1] The DSCC is an office within the BOP's Office Complex located in Grand Prairie, Texas. All facility designations or assignments and inter-facility transfers are processed and made by the DSCC.

in the correctional programs administration when seeking clarification about a specific policy/program statement. Finally, I have often conferred with the BOP's Office of Medical Designations about the confinement locations for inmates with serious medical issues. I am intimately familiar with the BOP's medical care rating system.

**Medical Care Numeric Assignment:**

Upon reviewing your client's Presentence Sentence Report, I believe it is highly unlikely that your client will be classified by the OMD as a Medical Care Level 3 inmate. The definition of a MCL 3 inmate, in short, is an inmate who is a "fragile outpatient in need of frequent clinical contacts to avoid hospitalization." Ordinarily, the OMD does not consider inmates with Autism Spectrum Disorders (especially those with Asperger's Syndrome) to require MCL 3 status. I have worked with many inmates with autism. Not one of those inmates were assigned to an MCL 3 facility.

In my experience, inmates classified at MCL 3 require far more medical care and related oversight than your client. Most are elderly inmates suffering from severe heart disease, renal failure, cancer and similar illnesses. Asperger's inmates can perform their Activities of Daily Living (ADL) and are generally not on any specialized medications.

**Conditions of Imprisonment**:

As you note, your client will be ineligible for designation to a minimum-security camp. He will be assigned to a secure prison (either a low-security FCI or a private contract prisons for sentenced aliens, likely the latter). These locations are far more dangerous than camps and conditions of confinement far more arduous. FCIs are five to ten times larger than camps. Camps ("FPCs") are fenceless compounds that have the appearance and feel of an austere college campus. An FCI is surrounded by barriers to prevent escape; walls, fencing with concertina wire, secured and defensible main gates, security lighting, motion sensors, and roving patrols. The camps house generally are first-time offenders who have committed nonviolent crimes, have minor to no criminal history and pose no public safety or flight risk. FCIs house inmates serving sentences greater than 10 years, likely have a prior record involving a gun or violent offenses, may be gang-affiliated, or are otherwise poor security or flight risks. FCIs also house all deportable aliens, members of organized crime, drug cartel leaders and all serious sexual offenders. Statistically there

is a 143% greater chance of being assaulted at an FCI as opposed to a camp.[2] Furthermore, the rate of "serious assault"[3] is 553% higher in low-security than minimum-security camps.[4]

**Private Prison Likely**:

Your will likely serve his sentence in a secure contract (private) prison for sentenced aliens (said prisons have a documented history for being substandard and more unsafe than a standard FCI). These privatized facilities comprise 15 percent of the BOP's total infrastructure. These institutions are favored by the BOP for the incarceration of deportable aliens, to save costs. Indeed, according to the New York Times, private prisons house an extremely high share of the nation's immigrant detainees—as much as "73 percent by some accounts."[5] Essentially the BOP's philosophy (while not publicly stated) is to house deportable aliens in facilities with few rehabilitative and release preparedness programs, and modest health care budgets, because the inmates will be sent back to their native countries in time and are therefore "someone else's problem." In my decades of experience, non-citizens are designated to private prison facilities in most of all cases.[6]

The DOJ and BOP understood the need to address these real and harmful problems within its privatized system when Deputy Attorney General Yates noted in a memorandum [8/18/16] that: "the federal prison population has begun to decline . . . [P]rivate prisons served an important role during a difficult period, but time has shown that they compare poorly to our own Bureau facilities. They simply do not provide the same level of correctional services, programs, and resources, they do not save substantially on costs . . . [T]he rehabilitative services that the Bureau provides, such as educational programs and job training, have proved difficult to replicate and outsource – and these services are essential to reducing recidivism and improving public safety."[7]

---

[2] This percentage is based on the average rate per month (per 5,000 inmates) of "inmate on inmate" assault (serious and less serious) from 2008-2017. *See* Federal Bureau of Prisons, Office of Research and Evaluation (data files on assault from 2008-2017) (on file with the affiant).

[3] "Serious assault" is defined in the BOP's *Inmate Discipline Program* (PS 5270.09, August 1, 2011) at page 44, Table 1 (CODE 101 - Assaulting any person, or an armed assault on the institution's secure perimeter (a charge for assaulting any person at this level is to be used only when serious physical injury has been attempted or accomplished)).

[4] This percentage is based on the average rate per month (per 5,000 inmates) of serious "inmate on inmate" assault from 2008-2017. *See* Federal Bureau of Prisons, Office of Research and Evaluation (data files on assault from 2008-2017) (on file with the affiant).

[5] *See* Clyde Haberman, *For Private Prisons, Detaining Immigrants Is Big Business*, N.Y. TIMES (Oct. 1, 2018), https://www.nytimes.com/2018/10/01/us/prisons-immigration-detention.html ("Private companies house about 9 percent of the nation's total prison population. But they take care of a much higher share of immigrant detainees—73 percent by some accounts.").

[6] *See* Joe Davidson, *Private Federal Prisons: Less Safe, Less Secure*, WASH. POST (Aug. 12, 2016), https://www.washingtonpost.com/news/powerpost/wp/2016/08/12/private-federal-prisons-less-safe-less-secure/?utm_term=.fe3ac3d3c4ea.

[7] Memorandum from Sally Q. Yates, Deputy Attorney General, to Acting Director, Fed. Bureau of Prisons 1 (Aug. 18, 2016), https://www.justice.gov/archives/opa/file/886311/download; *see also* Julia Zorthian, *Justice*

An Inspector General review of BOP contract prison facilities in 2016 found: "contract prisons incurred more safety and security incidents per capita than comparable BOP institutions . . . [T]he BOP must still improve its oversight of contract prisons to ensure that federal inmates' rights and needs are not placed at risk when they are housed in contract prisons . . . BOP needs to improve how it monitors contract prisons."[8] Other reports from 2012 through the present day still mirror/expand on the OIG findings and should be noted as well.[9]

The Trump Administration has seen an increased emphasis on incarcerating aliens, and an increased dependence on federal private prisons. In February 2017 Attorney General Sessions issued guidance reversing an Obama administration policy to phase out private prisons.[10] In a January 24, 2018 memorandum BOP Assistant Director Lara (Correctional Programs Division) effectively doubled down on the failed business side of privatized corrections. The memo from AD Lara stated: "In order to alleviate overcrowding at BOP institutions and to maximize the effectiveness of the private contracts . . . please submit eligible inmates for re-designation . . . for transfer consideration to private contract facilities."[11]

---

*Department Will Stop the Use of Private Prisons*, TIME (Aug. 18, 2016, at 3:02 p.m.), http://time.com/4457597/private-prisons-justice-department/; Press Release, Prison Legal News, U.S. Dept. of Justice Announces Phase Out of Private BOP Prisons (Aug. 19, 2016), https://www.prisonlegalnews.org/in-the-news/2016/us-dept-justice-announces-phase-out-private-bop-prisons/.

[8] U.S. Dep't of Justice, Office of the Inspector General, Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons (Aug. 2016), https://oig.justice.gov/reports/2016/e1606.pdf.

[9] Alene Tchekmedyian, *Thousands of Immigrant Detainees Sue Private Prison Firm Over 'Forced' Labor*, L.A. TIMES (Mar. 5, 2017, 5:00 a.m.), http://www.latimes.com/nation/la-na-immigrant-workers-20170305-story.html; Ryan J. Reilly, *Damning Report Finds For-Profit Prisons Are More Dangerous*, HUFFINGTON POST (Aug. 11, 2016, 5:32 p.m.), https://www.huffingtonpost.com/entry/for-profit-prisons_us_57acafe7e4b0718404101f14; Judith Greene & Alexis Mazon, Privately Operated Federal Prisons for Immigrants: Expensive, Unsafe, Unnecessary, Justice Strategies (Sept. 13, 2012), https://justicestrategies.org/sites/default/files/publications/Privately%20Operated%20Federal%20Prisons%20for%20Immigrants%209-13-12%20FNL.pdf.

[10] *See* Lauren Gill, *Trump Administration Giving Boost to Private Prison Campaign Donors, Leaked Memo Shows*, NEWSWEEK (Jan. 30, 2018, 7:21 p.m.), https://www.newsweek.com/trump-private-prison-campaign-donors-leaked-memo-795681.

[11] Memorandum from F. Lara, Assistant Director, Correctional Programs Division, Fed. Bureau of Prisons, to Chief Executive Officers 1 (Jan. 24, 2018), https://admin.govexec.com/media/gbc/docs/pdfs_edit/012518privateprisons.pdf; *see also* Biana Padro Ocasio, *Justice Department Reverses Directive to Phase Out Private Prisons*, POLITICO (Feb. 23, 2017, 6:31 p.m.), https://www.politico.com/blogs/under-the-radar/2017/02/justice-department-private-prisons-235324; Lauren-Brooke Eisen, *Trump's First Year Has Been the Private Prison Industry's Best*, SALON (Jan. 14, 2018, 3:30 p.m.), https://www.salon.com/2018/01/14/trumps-first-year-has-been-the-private-prison-industrys-best/; Gaby Neal, *BOP-Leaked Memo Suggests Private Prisons Are on the Rise*, CORRECTIONAL NEWS (Mar. 5, 2018), http://correctionalnews.com/2018/03/05/leaked-memo-bureau-of-prisons/; Justin Glawe, *How Many More Will Die in Private Prisons Under President Trump?*, DAILY

**Removal to the UK**:

I note your client will likely be held in ICE custody for weeks if not months past his sentence expiration date. Given the immigration crisis on the southern border, ICE resources in the northeast to process federal prisoner removals has been slowed dramatically the last six months or so.

ICE's Criminal Alien Program (CAP) is responsible for identifying, processing, and removing criminal aliens incarcerated in federal, state, and local prisons and jails—the enforcement of removal is overseen by ICE's Office of Detention and Removal Operations (DRO). When the prisoner's sentence is complete, they are placed in ICE custody and their status is changed from "prisoner" to "detainee." Armed ICE agents would transport your client (probably by bus) to another detention center once he is formally released from BOP custody to await the process of being physically removed from the U.S. Unfortunately, this involves further incarceration at what are typically county jails (contracted by ICE) to further wait on processing to finally be sent home. These detention and deportation procedures apply even for defendants who have the desire to leave the U.S. voluntarily at the end of their prison sentence.

Another disturbing result of the formal ICE deportation process is the length of time one can be held after their sentence has been satisfied. It can take up to six months for arrangements (internally within the U.S. and with officials of one's home country) to finalize the details necessary to complete this process. All the while an individual who should have been released from custody continues to languish in a strange and dangerous place while bureaucratic paperwork is half-heartedly shuffled between U.S. government agencies. Then there is the paperwork processed by the home country in coordination with the U.S. All of this is very time consuming and will impose a more substantial hardship on your client than it would upon a similarly situated U.S. citizen.

**Ineligible for Early Release**:

Normally, an inmate would be accorded a portion of their sentence for community re-entry through one of the BOP's Residential Re-Entry Centers (RRC) or "halfway houses." Toward the end of an inmate's sentence, for a period determined as required by his transitional needs, he would usually be pre-released to an RRC—likely between six and twelve months before his release date (18 USC § 3621). As a non-U.S. citizen, your client is not eligible for RRC or "halfway house" placement.[12]

---

BEAST (Feb. 7, 2017, 1:00 a.m.), https://www.thedailybeast.com/how-many-more-will-die-in-private-prisons-under-president-trump.

[12] *See* BOP, PS 7310.04, Community Corrections Center (CCC) Utilization and Transfer Procedure 10 (Dec. 16, 1998), https://www.bop.gov/policy/progstat/7310_004.pdf.

Further, most minimum and low-security inmates are also usually pre-released (in addition to their RRC or halfway house time) to home confinement for the last 10% of their sentence, up to a maximum of six months (18 USC § 3624). Again, your client will not be eligible for this program.

I hope I've answered your questions.

Sincerely,

*Joel A. Sickler*

Joel A. Sickler, Criminologist
*Justice Advocacy Group LLC*