1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )   Docket No. 15 CR 75
                                     )
4                  Plaintiff,        )   Chicago, Illinois
                                     )   January 28, 2020
5             v.                     )   1:04 p.m.
                                     )
6   NAVINDER SINGH SARAO,            )
                                     )
7                  Defendant.        )

8           TRANSCRIPT OF PROCEEDINGS - Sentencing
         BEFORE THE HONORABLE VIRGINIA M. KENDALL
9

10

        APPEARANCES:
11
    For the Government:      U.S. DEPARTMENT OF JUSTICE
12                           Criminal Division, Fraud Section
                             MR. MICHAEL THOMAS O'NEILL
13                           1400 New York Avenue NW
                             Washington, DC  20005
14
    For the Defendant:       DECHERT LLP by
15                           MR. ROGER ANSON BURLINGAME
                             160 Queen Victoria Street
16                           London EC4V 4QQ

17

18

19

20

21

22  Court Reporter:          GAYLE A. McGUIGAN, CSR, RMR, CRR
                             Federal Official Court Reporter
23                           219 South Dearborn, Room 2504
                             Chicago, Illinois 60604
24                           (312) 435-6047
                             Gayle_McGuigan@ilnd.uscourts.gov
25

1        (Proceedings heard in open court:)

2             THE CLERK:  15 CR 75, U.S. versus Sarao.

3             THE COURT:  Good afternoon.

4             MR. O'NEILL:  Good afternoon, your Honor.  Michael

5    O'Neill on behalf of the United States.

6             And with me at counsel table is Special Agent Gregory

7    LaBerta of the FBI.

8             THE COURT:  Good afternoon.

9             MR. BURLINGAME:  Good afternoon, Judge.  Roger

10   Burlingame on behalf of Navinder Sarao.

11            THE COURT:  Good afternoon.

12            Good afternoon, Mr. Sarao.

13            THE DEFENDANT:  Good afternoon.

14            PROBATION OFFICER:  Your Honor, Michael Alper on

15   behalf of U.S. Probation.

16            THE COURT:  Well, thank you for your report.  It was

17   very thorough, and I appreciate it, Mr. Alper.

18            PROBATION OFFICER:  Thank you.

19            THE COURT:  Okay, folks.  Let's begin, as we must,

20   with the report and the sentencing guidelines.

21            So we have some calculations that Mr. Alper put

22   together, and we do need to take them into account before we

23   turn to the 3553 factors.

24            But before I go through the guideline calculations, is

25   there anything factually within the report that either of you

1    want to change or alter in any way?

2            MR. BURLINGAME:  No, Judge.

3            MR. O'NEILL:  Not from the government, your Honor.

4            THE COURT:  Okay.

5            MR. O'NEILL:  There was one brief point of

6    clarification we noted in our sentencing submission with

7    respect to the application of the sophisticated means

8    enhancement, but the parties agree on the calculation, and

9    the -- that does not affect the ultimate guidelines

10   calculation.

11           THE COURT:  Okay.  Then I'm going to adopt Mr. Alper's

12   report.

13           And let's turn, for the record then at least, to those

14   guideline calculations.  And they begin, let's see, on page 10

15   with a base offense level of seven.  And that is for the wire

16   fraud statute and also the Title 7 statute.  And the specific

17   offense characteristic of loss amount, it's increased 20 levels

18   because of a loss being between 9.5 million and 12.8 million.

19   And, therefore, we're at 27.  And then there's a two-level

20   increase for ten or more victims, and a two-level increase for

21   committing the scheme outside the United States, which brings

22   us up to a level 31.  And then there's three levels off for

23   acceptance of responsibility, and that gives us a level 28.

24           Is there any objection to any of those guidelines?

25           MR. BURLINGAME:  No, your Honor.

1          MR. O'NEILL:  Not from the government, your Honor.

2          THE COURT:  So the guideline range is a criminal

3   history category I, there not being any calculable criminal

4   history.  And at 28 and criminal history category I, the

5   defendant is facing 78 months to 97 months.

6          And now with that in mind, I'm going to turn to the

7   prosecutor and turn to the 3553 factors, please.

8          MR. O'NEILL:  Thank you, your Honor.

9          And I will be brief in my presentation this afternoon

10  as we understand the Court is very familiar with the PSR and

11  the parties' submissions in this matter.

12         As set forth in the government's sentencing

13  recommendation and memorandum, we respectfully recommend that

14  the Court depart significantly from that advisory guidelines

15  range and sentence the defendant to a term of time served.

16         We appreciate that this is an unusual recommendation

17  from the government.  And, frankly, it's my belief and the

18  government's belief that this is a unique and extraordinary

19  case.

20         On the one hand, this defendant committed a serious

21  and sophisticated deceptive scheme.

22         On the other hand -- and, critically, for purposes of

23  today's sentencing -- this offense was committed under

24  exceedingly rare if not unique circumstances by a unique

25  individual who has both significant talents and significant

1    disabilities that the government and yours truly as the

2    prosecutor in this case have observed personally.

3         And this defendant extraordinarily, promptly, and

4    substantially cooperated with the government after fully

5    accepting responsibility for his actions and crimes.

6         He has extensively and substantially assisted the

7    government's investigation and prosecution of similar deceptive

8    and manipulative spoofing schemes in both specific ways as well

9    as broader programmatic ways in the way that he has informed

10   and illuminated the government's understanding of this type of

11   conduct and our ability to more efficiently investigate and

12   prosecute these types of crimes which can be, again, quite

13   sophisticated and opaque and costly to investigate and

14   prosecute.  So he has substantially aided the government's

15   efforts in that regard.

16        And because of the defendant's extraordinarily timely,

17   substantial, and truthful cooperation, as discussed at length

18   in our memorandum as well as the government's version of the

19   offense, the government moves this Court pursuant to guideline

20   Section 5K1.1 for a significant downward departure from the

21   applicable guideline range.

22        And the government submits that his sentence should

23   credit his cooperation and account for his extraordinary

24   characteristics and the nature and circumstances of his offense

25   as well as the other factors set forth in Title 18, United

1    States Code, Section 3553(a).

2         And, again, I personally have had an opportunity to

3    observe and better understand this defendant's history and

4    characteristics in the course of numerous and extensive

5    debriefing and preparatory sessions with him as part of his

6    cooperation.  And we've discussed, among other factors, that

7    the -- this defendant was clearly not motivated by any money or

8    greed.  Despite committing a fraud scheme, this was one that

9    was not done for monetary gain or greed.

10        We've discussed these factors and other bases for our

11   recommendation in our memorandum in the government's version.

12   And I believe they're also underscored by the defense

13   submissions, the report of the expert psychologist, as well as

14   the letters of family and friends in the defendant's support.

15        And the government has also submitted, your Honor, in

16   consideration of the sentencing factors in our memorandum the

17   reasons why we believe that restitution would not be

18   appropriate under the posture and circumstances of this

19   particular case.

20        And for the record this afternoon, I just wanted to

21   update our written filing of January 14th and note that to date

22   no possible victims have responded with any inquiries about the

23   case or have they submitted any victim impact statements since

24   we last informed the Court of the status in our January 14th

25   filing.  And I'm not aware -- I do not see any possible victims

1    appearing at this hearing this afternoon, your Honor.

2            As the Court knows, we have notified possible victims

3    through the -- pursuant to the Court's order through a DOJ

4    publicly administered website, and there have been certainly

5    extensive media reports regarding this case as well as today's

6    sentencing.  And so given the lack of identified victims to

7    date as well as the additional reasons discussed in our

8    memorandum, we'd respectfully submit that in this particular

9    case and under these circumstances the statutory exceptions to

10   mandatory restitution set forth in Title 18, United States

11   Code, Section 3663(a) apply here, and we recommend that no

12   order of forfeiture be issued.

13           And in closing, your Honor, for all of the reasons

14   I've stated here today and in our memorandum, we agree with the

15   recommendation of Probation and the defense in respectfully

16   recommending a term of time served as the just and appropriate

17   sentence in this case.

18           We'd also ask that the Court incorporate the final

19   order of forfeiture entered in April 2017 as part of the

20   judgment here.

21           I'm, of course, glad to address any questions or

22   issues the Court may have this afternoon.

23           THE COURT:  So as far as the -- first of all, I'll

24   grant your motion for departure to the extent that the

25   cooperation will be taken into account, and then I'll make a

1      determination about the extent.

2              But the cooperation, is he -- is it more than simply

3      the testimony in the one case that was here in this district?

4      I need to understand it better than that.

5              MR. O'NEILL:  Absolutely, your Honor.  And it is

6      indeed.  To begin there, but it is certainly not limited to

7      that case, the defendant's cooperation was critical in the

8      investigation, prosecution, and trial of Jitesh Thakkar in this

9      district before Judge Gettleman last spring, as your Honor is

10     aware.  And throughout those proceedings, the defendant's

11     cooperation was critical.  He engaged in numerous debriefing

12     sessions with the government and candidly and fulsomely shared

13     his account and impressions and interactions with Mr. Thakkar

14     who programmed and supplied one of the software programs that

15     the defendant, Mr. Sarao, used to engage in his spoofing

16     scheme.  And as we got closer to trial, he engaged in extensive

17     preparatory sessions with the government.  And as we set forth

18     in our memorandum, and as your Honor is aware from the

19     proceedings, Mr. Sarao testified over the course of two days in

20     the Thakkar trial.  And in the government's view, he did so

21     succinctly, cogently, and, most importantly, candidly and

22     truthfully in providing his account of not only his own conduct

23     but his understanding and perception of Mr. Thakkar's role in

24     it.

25              And the government, of course, respects

1    Judge Gettleman's ruling in that case as well as the outcome of

2    the jury which was not able to reach a verdict and that -- that

3    case ended in a mistrial.  But regardless of the outcome of

4    that case, the government submits that Mr. Sarao's cooperation

5    was incredibly substantial, truthful, and candid.

6          His cooperation was by no means limited to that case,

7    your Honor.

8          And I think a bit of history is instructive here

9    because it bears noting that Mr. Sarao was only the second

10   individual to be criminally charged with spoofing.  It was --

11   he was arrested in 2015.  He pled guilty before your Honor in

12   the fall of 2016 at a time when the government's understanding

13   of these rather sophisticated and opaque schemes and conduct in

14   anonymous electronic trading markets was robust at the time,

15   but still certainly something that was a relatively new space.

16   And because of Mr. Sarao's ability to share insight from his

17   own experience and his observations, his extraordinary ability

18   to recognize patterns in his electronic trading screen of

19   anonymous data, he has been able to really illuminate the

20   government's understanding of this type of conduct and to

21   significantly facilitate our ability to investigate it and

22   prosecute it efficiently.

23         And by as but one example as set forth in the

24   government's submission, Mr. Sarao, the defendant, recorded his

25   trading screen, his electronic trading screen, in part to

1    capture what he perceived in many cases correctly to be the

2    patterns of deceptive spoofing conduct by other traders.  Of

3    course, in doing so, he also captured himself committing the

4    offenses of conviction here.  But those tools, those training

5    videos provided very specific and instructive teaching tools as

6    part of his debriefings with the government, and he was able to

7    walk the government through specific examples of what he

8    perceived and help us better understand the nature of the

9    conduct.  And, since, that discussion has continued over

10   numerous debriefing sessions.  And while I noted in our

11   memorandum that the defendant's cooperation with the government

12   as currently contemplated is complete, we have no doubt that if

13   we were to call upon the defendant in the future, he would make

14   himself available to continue to assist the United States.

15        And so I think it bears noting that it is certainly

16   not limited to his cooperation in the Thakkar proceedings, but

17   that his substantial assistance has truly informed the

18   investigation and prosecution of other -- other offenders who

19   have committed similar spoofing and deceptive schemes.

20        Since the cooperation began, the government has

21   charged over a dozen individuals in 2018 with similar conduct

22   as well as additional several other individuals in the past --

23   past year, and there are other investigations ongoing that are

24   non-public, so he has been certainly a substantial and

25   extraordinary assistance provider in those matters.

1          THE COURT:  Okay.  From the defense, please?

2          MR. BURLINGAME:  Thank you, Judge.

3          I assume that the Court is familiar with our

4     submission, so I'm not going to --

5          THE COURT:  They're all right here.

6          MR. BURLINGAME:  Okay, good.  Go through it --

7          THE COURT:  But, you know, in a sentencing hearing, it

8     always baffles me that you wouldn't want to present everything

9     you want to present, especially when case law says that I need

10    to address all those issues.

11         MR. BURLINGAME:  Yes.

12         THE COURT:  So of course I'm prepared, but you need to

13    take up the oar now and tell me what you'd like me to do.

14         MR. BURLINGAME:  Sure.  Yeah, I'm pleased to do that,

15    Judge.

16         As your Honor saw, I spent a lot of time in the

17    memorandum talking about how Mr. Sarao's autism affects him and

18    sort of trying to flesh that out for your Honor.  So I was

19    thinking that I wanted to -- unless your Honor has questions

20    about that, I wouldn't go through the various sort of anecdotes

21    from the letters and statements from his family members and my

22    observations over the years that flesh that part of it out, but

23    more speak to why I think how his -- you know, who Nav is, how

24    his autism is inseparable and central to who he is, and how it

25    is central to why we're standing towards you, before you today.

1          And that's really what I was trying to do in the

2    sentencing memorandum, was to convey who he is, and it was

3    central to why I felt overjoyed when the government suggested

4    that he might be able to cooperate, because not only was I glad

5    for him to have the ability to provide substantial assistance

6    and all the benefits that that can bring to someone in his

7    situation, but I also felt that it's very hard to communicate

8    who he is without someone being able to experience that.  And I

9    was confident that after sitting in a room with him for just a

10   few hours, the government would end up in the place that they

11   are now of recommending time served because once you understand

12   this story and fully understand who he is, recommending that he

13   goes to jail is, I think, an inhuman result.

14          So that was what I was trying to convey with all of

15   the, you know, context in the submission.

16          THE COURT:  How much time has he served?

17          MR. BURLINGAME:  He did a little over four months in

18   the U.K., and then there were four days while he was here

19   for -- before the -- when he came to the United States

20   following extradition.

21          So, you know, there is -- as I said in the memo,

22   there's no doubt that Nav is here because he is guilty.  But

23   the -- a huge slew of the key factors that drive sentencing or

24   drive punishment are just not present in this case.

25          And the first is the lack of an understanding that he

1    was committing this crime.  As the FBI agent said and was

2    quoted as saying in the PSR, spoofing was prevalent in the --

3    at the time he started committing the offense, no one had ever

4    been prosecuted for it before.  No one had ever even been

5    prosecuted for the conduct of it, which could also be --

6    violate other crimes.  And Nav, having the special abilities

7    that he does, was trading, incredibly obsessed with his

8    trading, and seeing that all of these participants in the

9    market were doing this activity that was hurting his trading

10   and was driving him crazy.

11           And so he began calling the CME Market Regulation --

12   I'm forgetting the name of the division of the CME.  But he

13   started calling the CME over -- a couple of times a week over a

14   period of months and months and months saying:  I'm seeing this

15   spoofing, here's the time stamps on the trades, here's the

16   sequence that makes up the offense.  And the CME would

17   repeatedly -- you know, they would not get back to him.  And

18   then when he called back to report another instance, they would

19   say:  Oh, we looked at the last one you reported, and we don't

20   see anything wrong with it.  And this played out over and over

21   and over again over months until the CME was hanging up the

22   phone on Mr. Sarao because he was bothering them so much.

23           So Professor Baron-Cohen, who is certainly the U.K.'s

24   leading expert on autism and one of the world's leading experts

25   on autism, I thought wrote very eloquently about the -- that

1   people with autism have a need for clarity and definition

2   around rules, but they -- you're also bad at reading subtle

3   distinctions.

4           And I think for somebody in Mr. Sarao's situation in

5   2008 who didn't have autism to say after you called up the

6   market regulator and -- or the market and complained about

7   conduct over and over and over again and been told that it's

8   fine, that even somebody without autism might think, well, I

9   think this is wrong, but apparently this is okay.  But if

10  you -- the way Professor Baron-Cohen phrased it was that it

11  would be impossible for someone with autism to make the

12  distinction between written rules and rules as played.

13          And what I said in my sentencing memorandum which I

14  think fits perfectly is if you took, you know, a ten-year-old

15  boy who loves playing soccer and put him in a game and he gets

16  tripped twice, looks at the referee and says, "I just got

17  tripped, what's going on here," and the referee says, "Play

18  on," there's a certain point at which everybody understands

19  that that's the game that's being played.

20          And I think that where, you know, another way that

21  Nav's autism factored into this is that then once he began

22  doing this conduct from that place, he then did it so

23  obsessively and also, you know, for lack of a better word, so

24  well, so efficiently and in such volume, that he then managed

25  to attract the attention of the very people he had been

1    complaining to years later that led to this case.

2        (Brief interruption of the proceedings.)

3            THE COURT:  Sorry.  Excuse me.

4            MR. BURLINGAME:  It's not to say he didn't know he was

5    doing something wrong.  He absolutely did.  That's why he was

6    complaining about it to the CME.

7            But the step that he never made, which I think is

8    critical to informing what the right punishment is, is he never

9    said, I understand that this is illegal, I understand that I'm

10   going to break the law, and, you know, maybe I'll end up in

11   jail, maybe I don't care, but I am going to take this step that

12   I know you are not allowed to do in society.

13           And I think that that step, being willing to break the

14   law when you are aware that the conduct you're engaging in is

15   illegal to that degree, is -- is a different -- is a threshold

16   that most people who are standing before your Honor for

17   sentencing pass through.  And I think it's a very rare case

18   where you have somebody who does have the mental intent to

19   clear the element of the crime, he was trying to trick the

20   counterparties with the spoof trades, but also would never in a

21   million years have engaged in one of them if he knew that it

22   would lead to a day in jail.  It's just not -- that is a unique

23   confluence of circumstances.

24           And I think one of the things that underlines -- that,

25   you know, allows your Honor to place faith in that is the utter

1    lack of concern for the money.  I mean, I said in the

2    sentencing memorandum that we tried to find a case where -- a

3    fraud case where there is no -- the money is irrelevant to the

4    fraud.  And not surprisingly, it was impossible -- or it was

5    impossible for us to find one.  You know, there are plenty of

6    cases where someone is committing a fraud because they hope

7    it's going to benefit their business or, you know, maybe it's

8    even a sympathetic reason of I don't want to have to fire my

9    employees and -- so courts will take that into account and be

10   lenient on that basis.

11        But to have a fraud where the money is literally

12   irrelevant to the -- to the conduct, to the person's

13   motivation, is I think a singular fact.

14        And to the extent that your Honor is concerned about

15   any kind of sentencing disparities, I think, you know, there

16   are a number of factors which create this -- you know, make

17   this case as a precedential footprint I think zero.  But that

18   one is one that I don't see ever being repeated.

19        You know, this was for him an activity that was

20   incredibly engaging, allowed him to exercise his special

21   talents in a very engaging way.  And, you know, I truly think

22   that there was no difference between Nav obsessively playing

23   FIFA, and, you know, being furious with not getting a high

24   score in his online competitions in this video game and Nav

25   obsessively trading the 500 -- S & P 500 E-Mini.  It's -- you

1  know, to him it was just a much better and more complicated

2  game.  And the money was the byproduct of his desire to be the

3  best in that game which he was focused on like a laser.

4          THE COURT:  What about the fact that he met with the

5  computer programmer and paid 24,000 to get a computer program

6  to aid him with it?

7          MR. BURLINGAME:  I think that that was -- you know, he

8  witnessed what others were doing in the market and immediately

9  started doing the manual spoofing conduct that he could do by

10  himself once he made the decision I'm going to stop complaining

11  about this and start doing it.  But there were techniques that

12  he was witnessing that you could not do without the assistance

13  of a machine.  It's a machine-dominated market, and, you know,

14  the counterparties to these trades are almost all robot-trading

15  algorithms from, you know, from hedge funds, high frequency

16  trading funds.

17          And so, you know, there is no doubt that he, when he

18  engaged in this conduct, he really engaged in this conduct.

19  But I think that is also -- the autism is inextricably

20  intertwined with that in that, you know, there was no moment

21  where he picked his head up from this obsessive game and said,

22  hey, what am I doing here, is this -- you know, am I

23  potentially getting myself in trouble?  This is -- these guys

24  are doing this, I want to play with these guys, I want to be

25  the best in this thing, this is what I need to do.

1    I think -- I was just going to mention that the -- I

2    think the autism is also, you know, to the extent it's -- I --

3    you know, it's undisputed by the government or Probation, but

4    to the extent there is, you know, additional evidence needed

5    for -- that he would not have engaged in this conduct had he

6    understood that it was, you know, really illegal, for lack of a

7    better word, that it could possibly lead to these consequences,

8    is the intense fear that he had of jail that he'll talk about a

9    little bit when he makes his statement to the Court, and his

10   obsessiveness in following rules, that part of what was going

11   on when he's calling the CME is not just, hey, these guys are

12   cheating, can you look at this and make them stop, but also

13   what is happening here, is this the way trading is allowed on

14   this market?  And he's getting the signal back, it is.

15       I think the next factor for the Court to consider is

16   how the autism affects his punishment, both prospective and the

17   punishment that he's already received for this, which I think

18   for -- if he was standing before you and did not have the

19   autism, four months might seem like a fairly lenient crime and,

20   you know, it did not escape me that time in Wandsworth in

21   London does not sound that bad compared to four months at the

22   MCC with the kettles and windows and, you know, various other

23   amenities, but it was total torture for him.  I was visiting

24   him weekly during that period.  And he didn't sleep.  It's not

25   an exaggeration to say he was sort of fitfully sleeping an hour

1      a day, and that is torture.  That's -- you know, governments

2      torture people through sleep deprivation.  And that environment

3      with his sensory hypersensitivity is one in which he just

4      cannot sleep.  And he started to fall apart, and he started to

5      become impossible to communicate with, impossible to have

6      meaningful conversations with.  And, you know, according to

7      Professor Baron-Cohen who examined him was, you know, was

8      suicidal at the time.

9             And I witnessed that after he had been at the MCC for

10     a few nights prior to the bail hearing before your Honor, in

11     that he wasn't sleeping at all.  It was sort of sufficiently

12     more harsh that he is now up for 96 hours or something like

13     that.  And he came in and said to me, you know, I'm a little

14     worried 'cause I started having bad thoughts last night about

15     doing anything to get myself out of this situation of the

16     noises and the lights and not being able to sleep and not

17     escape these noises, not escape these lights.  And I didn't

18     know what to say.  He had one more night left.

19             And, you know, I was an AUSA for 10 years, I've been

20     doing this job for 20 years and have had big trials and I

21     thought were going to be this, you know, very scary witnesses

22     to address.  By far, the scariest court appearance I've ever

23     had in my life was the agreed-upon bail package before your

24     Honor where the government was mightily recommending that he be

25     released on bail because I was deathly afraid if he did not get

1    on bail he was not going to survive for another week at the

2    MCC.  You know, what he had been thinking about the night

3    before was I need to do anything to make this stop.

4            And so not only does that speak to that a sentence

5    that involves further incarceration places him at risk, but

6    also just how bad those four months in Wandsworth were and just

7    how harsh that punishment is, and also just how harsh the

8    punishment of the last five years, knowing that he's had a

9    potentially long jail sentence -- you know, pleading him guilty

10   to the guidelines range in this was also a terrifying moment in

11   that if -- in that I've always thought he would not be able to

12   withstand more time in jail, and my hope was that the

13   government would come to the conclusion that they did and that

14   Probation would come to the conclusion that they did and that

15   anybody who is exposed to him would realize that this is a

16   person who, you know, even setting aside all of the factors

17   that cry out for leniency from the way, the nature and

18   circumstances of the crime, but, you know, how extraordinarily

19   harsh a punishment jail is for him.

20           THE COURT:  Well, it's a rarity to see the government

21   recommending a sentence like that, so -- I'm sure you haven't

22   been on the receiving side of that before.

23           MR. BURLINGAME:  I have not, Judge.

24           And so it's -- I mean, it's primarily the sound and

25   the light of jail, but it's also the forced socialization is

brutal.  And it's also the separation from his family.  He has

a tiny support network of basically his parents, his brother

across the street and their children, and his other brother who

he sees once a week.  And, you know, that was bad when he was

incarcerated in London.  And here, you know, unfortunately,

none of them are -- don't have the financial means to be able

to make it here for sentencing, but -- you know, for the same

reason they will not be able to visit him and, you know, I

think that's a clear third on the list of reasons why jail

would be torture for him, but it adds to the harshness of the

punishment.

He's also been punished in that he is an intensely

private person.  And, you know, this case has received some

media attention here, but it is -- the British press really

likes a story, and this case has been on the front pages of all

the newspapers.  He is a household name in -- for anyone

touching the financial services industry and is -- I live in

London and have yet to meet somebody in the five years I've

been representing where I say -- you know, they say, What do

you do, blah, blah, blah, have I ever heard of -- would I have

ever heard of anyone you represented, and I say, oh, did you

ever hear about the guy from Hounslow?  And they're, like, oh,

yeah, I know that story.  It's -- it's hugely -- it's -- the

media coverage was saturation, and the coverage has been

humiliating.  It's -- you know, a lot of it are the details

1    that were included in the sentencing submission, which I didn't

2    relish putting those in the sentencing submission, but I

3    thought it was important for your Honor to, you know,

4    understand who he is and -- and -- but that is -- you know,

5    he's not a -- he's a smart guy, and having the whole world have

6    this information about him has been brutal.

7         He also -- his parents are private, religious people.

8    You know, it's been a media circus.  They had the press camped

9    out outside their house.  Every time we would go to court,

10   there -- it would be significant court appearances on his

11   extradition case, and we would be trying to have conversations

12   with him about what would happen at the court appearance and

13   decisions we had to make, and all he could think about was

14   how -- what -- how many photographers were going to be out

15   front, how big would the crowd of photographers be, would he be

16   able to make it through, how were we going to get through the

17   crowd of photographers, what route should we take to the

18   courthouse.  You know, we got here this morning at

19   10:00 o'clock in the morning because -- so that Nav would be at

20   ease that maybe we would show up before the photographers would

21   and we wouldn't have to go through that experience again.

22        It's -- it's -- so, again, compared to the torture of

23   being in jail, it's small potatoes, but it's real punishment.

24        And as I said, I think that the -- having the kind of

25   fear of jail that he does, which is the fear that you will lose

1    control of your mind and hurt yourself and you know that you

2    have no ability to control that because you have no ability to

3    just stop being this way and go to sleep, and -- and for five

4    years you live day-to-day with the knowledge of this may be in

5    your future and you have no way to get better at this, there's

6    no way to solve that problem, has been its own form of torture

7    and punishment.

8             Nav is going to speak very eloquently about the

9    journey that he has been on through that five years and -- and,

10   you know, that there's been a silver lining to this for him,

11   but it has been very difficult.  I've seen him throughout that

12   period and, you know, he's living in terror of potentially

13   going back to jail.

14            I think that understanding his autism and how it got

15   us here today is also critical in informing the potential for

16   any recidivism.

17            I think -- you know, he never made the decision to

18   break the law and risk going to jail.  He never would have.

19   And there is zero reason to believe that now for the first time

20   he's going to decide to embark on a life of crime.  He's never

21   been in any trouble other than this.  He's been on supervised

22   release for five years, and he's followed the rules of it

23   meticulously.  Also consistent with his autism and also, you

24   know, I think a statement from Professor Baron-Cohen's letter

25   that spoke to this was saying, you know, now that he knows what

1    the rules are, the risk of him breaking those rules is zero.

2           And I think what Nav now also understands, both

3    primarily from this experience but also from the experience of

4    having all his money stolen, is that he has some major deficits

5    and that when significant things are happening in his life now,

6    you know, his brother, me, his parents, other people are going

7    to be consulted about any kind of decisions he makes because he

8    now has an understanding of that he has -- has a deficiency in

9    some areas.

10          THE COURT:  Is he receiving counseling?

11          MR. BURLINGAME:  He went to, in a low moment for the

12   NHS, he went to go get counseling, and they recommended drugs.

13   He doesn't believe in taking drugs and didn't think that --

14   that felt like that would be ducking the problem and not

15   solving the problem.  So there was a counseling course

16   available, but they informed him that they would not allow him

17   to partake in the counseling course given the uncertainty

18   caused by having the criminal case hanging over him.  So that

19   has been on hold for five years, but he is eager to -- you

20   know, he was -- it was news to him that he had Asperger's when

21   he got the diagnosis and was eager to -- I mean, I thought his

22   reaction to it was great, which was, you know, not shame, but

23   was this is interesting, I've read all about it and this makes

24   a lot of sense and I'd like to learn more about how to live

25   with this.

1          And so I'm positive that he will, once this is all

2     behind him and he can get treatment from the NHS, that he will

3     be back there participating in those classes.

4          I'm -- of course, if your Honor has any other

5     questions, I'm happy to answer them.  But, otherwise, I would

6     just humbly request that your Honor follow the recommendations

7     of Probation and the government and impose a sentence of time

8     served.

9          Mr. Sarao poses no risk to anyone.

10         His case is a cautionary tale in England and

11    throughout the financial community that took this crime that

12    nobody knew about, spoofing, and put it on the map, and also

13    put on the map that it's a crime that ends with you destitute

14    and in jail.  So the deterrence message could not be -- have a

15    bigger megaphone and be stronger.

16         He has been punished severely for the reasons that I

17    went through.

18         And the extraordinary confluence of factors that led

19    to us being here I think argue profoundly for leniency.  I'm

20    confident I will never represent another person who repeatedly

21    called up the regulators to complain about the conduct that he

22    was about to engage in and then videotaped himself engaging in

23    the conduct to create a record of the crime or evidence of the

24    crime.  It's just -- you know, it is mind -- I think I said in

25    my sentencing determination that it is -- it's kind of

1    determinism, that the regulatory evolution of spoofing

2    enforcement -- you know, we were two years away from Dodd-Frank

3    being passed and spoofing actually becoming a law that the very

4    few people who were involved in the passage of Dodd-Frank knew

5    about when Nav started complaining about it and then engaging

6    in this conduct.  And, you know, rather than it was bad luck, I

7    think it was if you dropped him, you know -- once he was

8    introduced to the S & P 500 E-Mini market, realized that he was

9    great in it, created it, got obsessed with trading, this thing

10   was going to play itself out exactly as it has, you know, a

11   thousand times out of a thousand.  He would spot this conduct.

12   He would say that's wrong, I don't like that.  He would

13   complain about it.  And then he's playing this game, he wants

14   to win.  He's going to go do the same thing he sees the other

15   big boys doing because he wants to be like them.

16        I couldn't agree more with the government that

17   additional -- their quote was "additional incarceration would

18   pose no benefit to Mr. Sarao or society," and I beseech your

19   Honor to return him to his family.

20        THE COURT:  Do you have anything that you want to

21   reply to or add after his presentation?

22        MR. O'NEILL:  Your Honor, nothing -- nothing to reply

23   to, but other than to echo Mr. Burlingame's presentation.  I

24   think the characteristics and the challenges that

25   Mr. Burlingame spoke to in his submission and before your Honor

1     today are ones that I personally have observed in numerous

2     sessions with Mr. Sarao, as have my colleagues.

3            I think as to, among other factors, I think to echo

4     the concept of deterrence, I think from what I've observed of

5     Mr. Sarao, I could not agree more that he poses zero risk of

6     recidivism.  And he's expressed immediately remorse and

7     acceptance of responsibility.  In his -- in the first minutes

8     of his first debriefing session with me personally and my

9     colleagues, with the government, he accepted responsibility for

10    his conduct and has been, I think as the special agent noted,

11    he's been punishing himself mentally since.

12           And we do -- we do respectfully submit that given the

13    really unique circumstances of this defendant and the unique

14    situation of the nature and circumstances of his offense and

15    what it's brought us all before your Honor today that

16    additional incarceration would affect him particularly severely

17    and adversely, as Mr. Burlingame noted, and something that --

18    the effects of sleep deprivation on Mr. Sarao are effects that

19    I've observed even in advance both -- both in the days leading

20    up to his plea hearing before your Honor back in 2016 and in

21    the days leading up to and in preparation for the Thakkar trial

22    when Mr. Sarao was here in Chicago away from his home, but, of

23    course, not at that time incarcerated, even that circumstance

24    affected him severely and measurably and something that we

25    could observe.

1       And so I do want to underscore that it's our belief

2   that there's no specific deterrent need for additional

3   incarceration for this defendant, nor is there a societal need,

4   given the unique posture and circumstances of the case, that we

5   do believe that the sentence of time served here and under

6   these extraordinary circumstances would send a message to the

7   public and to the financial industry, to other traders, that if

8   you engage -- notwithstanding the severity of this conduct, if

9   you engage in this conduct but you nonetheless immediately

10  accept responsibility, cooperate fully and extensively,

11  truthfully and candidly with the government, in a space where

12  you have new and valuable insight to share in particular, which

13  is sort of the unique situation that Mr. Sarao was in, as,

14  again, only the second individual charged with this type of

15  crime, he was uniquely -- rarely if not uniquely situated to

16  provide the type of substantial assistance he did.

17      And so while the opportunities to be credited with

18  that kind of extraordinary cooperation in an extraordinary

19  moment may be limited if -- you know, the door for that type of

20  cooperation has certainly narrowed substantially, if it isn't

21  closed, your Honor, and so -- but in -- you know, schemes are

22  always evolving.  And these complicated financial schemes, to

23  investigate them efficiently and thoroughly, the government

24  benefits greatly from truthful and substantial cooperation.

25  And so we hope that the recommended sentence will serve that

1    message as well.

2            And we do believe, as I think the defense noted, that

3    this is such a rare case that it is one appropriately without

4    precedent and would -- it's hard to picture how this case could

5    serve as a precedent going forward, given -- given its posture

6    and given the unique circumstances of this defendant.

7            THE COURT:  Okay.  Mr. Sarao, before I sentence you,

8    sir, you do have the right to address the Court.  Would you

9    like to say something?

10           THE DEFENDANT:  Yes, I would.

11           THE COURT:  Okay.  Could you stand in front of the

12   microphone, please?

13           THE DEFENDANT:  Thank you, your Honor.

14           In the last five years since my arrest, I've changed

15   more than I did in the previous 36 years of my life.  From the

16   moment I started trading, I became completely engrossed in it.

17   It was only after I was arrested that I realized that I was

18   totally addicted to it.  I made more money than I could have

19   ever imagined, but -- but I did not feel any different.  I was

20   still just me, but I felt pressure to live a different life.

21           When I was at home playing video games, that was okay

22   when I was poor; but now that I was rich, surely I should be

23   doing something more extravagant.  But whenever I thought about

24   buying nice things, I knew that I would just get bored of them.

25   I had done the things that the world told me would make me

happy:  Be successful in your career, make lots of money.  But
I learned first-hand that money doesn't buy happiness.  It was
good to know that for certain, but it made me question where to
find happiness if what I had been told was a lie.  I wrestled
with this.  And new trading was not bringing me deeper meaning,
but I didn't know where else to find it.

On the 21st of April, 2015, my life changed forever.
I had just finished trading when police burst into my house and
arrested me.  I had seen TV shows about prison and thought to
myself, I could never survive there, that's one thing I
couldn't do.  But that's where I was going.

I can assure you, your Honor, if I knew there was any
chance I would have spent a minute in jail for spoofing, I
would not have placed even one spoof order.

I was angry and bitter when I was in prison.  I was
stuck in hell, not knowing when it would end.  I had just
learned that people I trusted scammed me out of all the money I
earned, and the press were trying to humiliate me and my
family.

On the day my final bail appeal was denied, I hit lows
that I never could have imagined.  I survived and decided that
I will try to establish a real and proper connection with God
and put all my faith in Him.

A few weeks later when I did get out of prison, my
brother gave me a spiritual book that would change my life

forever.  "The Spiritual Saint" would change my mind into one where I could find the silver lining in every cloud and put me on a road to happiness which I thought was blocked off forever. I got all the books this author had ever written as well as many others and built a library of 45 spiritual books all shipped over from India.  They allow me to grow my connection with God through prayers, faith, and meditation and to cleanse myself and benefit from God's wisdom.

A little over a year after I left prison in London, I had to go to America.  I didn't know what to expect when I met the two agents who would take me to the U.S.  But we chatted during the flight, and it was not long before I was as comfortable around them as I was around anyone I know.

I'm also grateful to the prosecutors for the chance they gave me to help them.  I will do so for as long as they want me to.

Prison in the U.S. was even more difficult than in London.  I had been reading that I should try to find a positive in even the harshest situation, but I was struggling. I tried to grit my teeth and stick it out, but my will faulted and I became scared that I would pass away from a lack of sleep.

Your Honor released me on bail, and I will always be grateful to you for that.

In the time since, I've strengthened my belief in

1    karma, accepting that life is inherently fair, and that I must

2    not bring harm to others in any way, knowing full well that the

3    same will come back to me.

4            The books I've read have been life-changing.  And if I

5    still had the full $70 million I made, I would be more than

6    willing to pay all for them.

7            As I think about the last five years, despite the

8    horrible lows, I can honestly say that what I have gained has

9    outweighed the negative.

10           I spent 36 years trying to find happiness on a path

11   built on a lie.  I became lost and did not know how to achieve

12   the happiness that is our birthright and origin.

13           I would like to say how deeply sorry I am to all those

14   that were affected by my spoofing.

15           I also want to apologize to my family for all the

16   embarrassment I have caused them.  None of our family has ever

17   been convicted of a crime, and I know my actions have hurt our

18   good name.  My parents especially have been through a lot, and

19   they've never done anything but work hard.  My guilt is heavy

20   for what I have put them through.

21           My biggest fear now, given my Asperger's and insomnia,

22   is that I am to be returned to prison and that the pain will

23   continue for me and my family.

24           I humbly ask for your mercy, and I can assure your

25   Honor that I will never do anything illegal ever again.

1          Thank you, your Honor.

2          THE COURT:  Okay.  Thank you, Mr. Sarao.

3          All right.  The way the sentencing works under our

4    structure is that I take into account first that guidelines

5    range, which I mentioned earlier was 78 to 97 months.

6          And then I turn to the 3553 factors, which include

7    your personal characteristics.  Also it includes the

8    seriousness of the offense.  It includes general deterrence and

9    specific deterrence.  And then whether my sentence will promote

10   respect for the law.  And then I look at your own individual

11   characteristics for the type of sentence that I'm crafting.

12   And then, finally, just that the sentence is not one that is

13   too great to reach those goals.

14         So we'll start with the seriousness of the offense.

15         And it's remarkable, when we stand here today and see

16   you and I've had this volume of material to read through

17   regarding you because when the case came this way, I think

18   myself and the public probably assumed we had quite the

19   mastermind of someone who was really manipulating in a, shall

20   we say, not evil, but say disparate way to really impact the

21   market for financial gain.  And, instead, here I'm looking at

22   this report of someone with developed autism who lives with his

23   parents and in a bedroom that looks like it's been not changed

24   since he was 13 years old with stuffed animals and things on

25   the bed, and you recognize that there's a whole different

1    motivation going on.

2         However, it doesn't impact the seriousness of what

3    happened on the day that -- back in 2010 when the integrity of

4    the market was impacted by your actions.

5         What are you going to do?

6         MR. BURLINGAME:  I -- I just wanted to note for your

7    Honor that the press release said that there was a -- Mr. Sarao

8    was a contributing factor to the flash crash, but that is

9    not -- I have not -- I've spent quite a bit of time, and I've

10   not seen there's been a lot of serious analysis of what caused

11   the flash crash, none of which has attributed it to Mr. Sarao

12   and his actions.  There -- he was trading on that day --

13        THE COURT:  Is there something improper about me, in

14   the words that you just said, that they contributed?  Correct?

15        MR. BURLINGAME:  Yes, I just -- we didn't address

16   that, so I just felt remiss in -- I mean, I think this probably

17   diminishes it too much.  But if you are in a traffic jam, just

18   sitting there, you're contributing to the traffic jam.

19        THE COURT:  Right.

20        MR. BURLINGAME:  And -- that's all I want to say.

21   Sorry, your Honor.

22        THE COURT:  Okay.  I'm not holding him responsible for

23   a flash crash, nor did I use those words.

24        MR. BURLINGAME:  Sorry.  There was just a lot of press

25   about it, and I just wanted to -- sorry, your Honor.

1        THE COURT:  Okay.  So your actions contribute to

2   abusing the integrity of the market, which is something that is

3   essential to maintaining a healthy economy.

4        And so in spite of the fact that the spoofing seemed

5   like a video game, it actually has very significant economic

6   impact.  And, therefore, it's a serious offense, and one of the

7   characteristics that I'm taking into account that is not

8   mitigating.  Okay?

9        Now, let's talk about what is mitigating in your

10   sentencing structure.

11        First of all, you have accepted responsibility

12   immediately.  You agreed to a forfeiture judgment, nearly $13

13   million.  You immediately began cooperating with government

14   agents in an effort to enable them not only to work other cases

15   but to understand this complicated type of crime.  And,

16   therefore, you put yourself in a unique situation to help

17   yourself.  And it is extraordinary acceptance.

18        Now, in this district, typically when a defendant

19   makes a case against another individual that they didn't have

20   before, the government in their 5K1 motion asks for a

21   50 percent reduction, and then a greater reduction if there is

22   other cases -- if there are, excuse me, other cases.

23        And here there was the case in front of

24   Judge Gettleman, but there was also over, as mentioned, a dozen

25   individuals that were being investigated based upon what you

1    taught the government to do and understand.  So that is

2    extraordinary cooperation.  And in the general terms of the way

3    things would be used around here, that can impact you to have a

4    75 percent reduction.  50 percent would be for one defendant,

5    and then the others that you have just mentioned.  That brings

6    you down to 26 months.

7              And now I'm looking at your specific characteristics.

8              So, first and foremost, there's no criminal history.

9    There's no inkling that you would have committed another crime

10   in the past in your sentencing submissions here.  So you've

11   lived a law-abiding life.

12             Then we look to whether you would do something in the

13   future.

14             I'm very, very familiar with autism and Asperger's,

15   and I credit to both parties the statements that were made

16   regarding the use of electronic device, whether it be trading

17   versus game-playing, internet-playing, whatever you want to put

18   it in, that that would be something that, with someone with

19   Asperger's or autism, does not have the same judgment level

20   that someone who is -- has the *mens rea* to manipulate would

21   have.

22             The other thing that I do credit both parties with is

23   that the impact of prison is very difficult on someone who has

24   these auditory heightened senses and this forced socialization.

25   That is real, and it would make whatever sentence I impose more

1  difficult for Mr. Sarao than someone who does not suffer from

2  those things.

3  What I note, intriguingly, about the case here is that

4  while he was earning money, he was living in mom and dad's

5  house in this bedroom, as I mentioned, and doing things like

6  buying McDonald's with coupons, right?

7  So the difficulty here as the judge on this case is to

8  not negate the *mens rea*, which says I know what I'm doing, I

9  did this, because then, of course, we wouldn't be standing here

10 at a sentencing hearing, but also to recognize the naivete that

11 he exhibits from his autism with this curious flash of

12 brilliance in the technical world that allows him to see these

13 patterns, et cetera.

14 So it's a very unique case, and it's an outlier of

15 cases in that the behavior was one that could have had a

16 significant impact and also was one that once was uncovered, he

17 immediately and completely confessed and aided the government

18 with their efforts to reform.

19 So with the Asperger's and the mental issues that show

20 this naivete, I do think that that's a factor that's

21 mitigating.  And I think to the extent that there's a variance

22 based upon that, it would be a 12-month variance.

23 And then that leaves me with a 14-month -- I mean, I

24 think there's a very way of looking all of these -- looking at

25 all of these terms.  And he served four months in prison.

1          So my sentence will be going forward one year of home

2     incarceration where he is not permitted to leave his home

3     because I think that if he were put in the social setting of a

4     prison, he would have some extreme difficulties based upon the

5     doctors' reports that I've read and the other materials that

6     have been submitted to me.

7          He has the judgment of the forfeiture, which is going

8     to be part of the sentence.

9          I'm not going to add supervised release because I

10    don't believe that there's going to be recidivism here based

11    upon his extreme remorse and his continued cooperation with the

12    government.

13         And the restitution is impractical, so I can't give a

14    restitution order, although I can give the $200 special

15    assessment.

16         It is a rare thing in this building to have the

17    government seek a time served sentence.  And I take that -- I

18    don't take that lightly because when they say that this

19    cooperation has been this intense and this immense, then

20    clearly they are the ones who have had the one-on-one

21    interaction with him to make that assessment, and I'll respect

22    that.  And with that level of cooperation, a significant

23    reduction is necessary.  And then with his own mental health

24    issues, a further variance is necessary.

25         So my sentence will be one year of home detention --

1    or is it home incarceration?

2              PROBATION OFFICER:  Your Honor, I'm -- I apologize.

3    I'm a little confused.

4              You're not ordering any supervised release, correct?

5              THE COURT:  That's right.

6              PROBATION OFFICER:  I don't believe our office would

7    have any way --

8              THE COURT:  Oh.

9              PROBATION OFFICER:  -- of enforcing it because he

10   lives in London.

11             THE COURT:  Got it.

12             PROBATION OFFICER:  There would be no way --

13             THE COURT:  So we would have to do supervised release

14   and as a condition.

15             PROBATION OFFICER:  Even then, it would be very

16   difficult to enforce home incarceration in a foreign country.

17             I can check with our officers if we take a break, but

18   I don't know how that could be --

19             THE COURT:  I don't think that the sentence -- well,

20   I'm not going to disagree with you.  I'll definitely look into

21   it.  But my interest is that the sentence, it needs to be

22   serious enough to reflect the magnitude of the crime.  So we're

23   going to work it out and figure it out.

24             MR. BURLINGAME:  Judge, what we suggested in the

25   sentencing memorandum if your Honor wanted to impose a sentence

1    of home confinement -- thank you, your Honor, for the sentence

2    and your leniency -- would be that -- I know that Mr. Alper's

3    office, from my communications with him, that he's not allowed

4    to -- that they can't dial internationally, but my law firm

5    would be happy to set up a -- where he can dial a local number,

6    it bounces directly to Mr. Sarao's house, and he can be

7    monitored by phone calls at any time of the day or night to

8    make sure that he is in the house.

9           THE COURT:  I can't believe that I -- my sentence is

10   going to be hampered by not being able to dial internationally

11   when you can Skype or Facetime someone over the internet and

12   see their face and talk with them.

13          PROBATION OFFICER:  If we could take a ten-minute

14   recess, can I speak with the officers that handle that

15   condition?

16          THE COURT:  Absolutely, yes.

17          PROBATION OFFICER:  Thank you.

18          THE CLERK:  All rise.  Court is in recess.

19      (Recess taken from 2:08 p.m. to 2:27 p.m.)

20      (Proceedings heard in open court:)

21          THE CLERK:  Please be seated and come to order.

22          PROBATION OFFICER:  I consulted with the experts in

23   our office who handle the home detention.  They did say that

24   the voice ID system is not workable because of the difference

25   in technology between American phones and European phones.

1           We could work out either via iPhone, Facetime, we

2    could try to work a Skype, or we may be able to work a phone

3    number where we can call him --

4           THE COURT:  Through his attorney.

5           PROBATION OFFICER:  -- intermittently -- either

6    through his attorney or call his home number directly.  There

7    may be a phone in our office that has the ability.  If not,

8    we'll --

9           THE COURT:  Okay.

10          PROBATION OFFICER:  If your Honor orders it, we'll

11    make it --

12          THE COURT:  Okay.

13          PROBATION OFFICER:  We'll find a way and make it work.

14    We'll call him intermittently and check on him.

15          THE COURT:  So my only question for you then, is it

16    considered probation with as a condition home confinement?

17          PROBATION OFFICER:  Or your Honor could order time

18    considered served, supervised release for whatever term you

19    wish, with the condition of --

20          THE COURT:  We'll do it that way.  So time considered

21    served with one year of supervised release with as a condition

22    home confinement.

23          So home confinement means that you're only permitted

24    to go out for medical, religious, health reasons.  And you have

25    to stay within your home.

1          So then I have to go through some supervised release

2    conditions with you.

3              MR. BURLINGAME:  Judge --

4              THE COURT:  Who said "Judge"?

5              MR. BURLINGAME:  Sorry.  I just wanted to -- if it was

6    possible to allow him to get some exercise, to have certain

7    discreet periods during the week where he could get exercise,

8    and he also buys and eats all his own food, and so just some

9    discreet times when he's allowed to get out of the house to go

10   shopping.

11             THE COURT:  No.  No.  I want this to be a sentence.

12   This is a sentence that is -- the only reason that he's allowed

13   to stay in his home from my perspective is because of the

14   uniqueness of his medical condition that causes him to suffer

15   more in the incarceration aspect of the detention rather

16   than -- I'm not giving him time to go to the gym.  He's got to

17   take a sentence based upon the strength of this case.

18             Okay.  So supervised release conditions, I need to go

19   through.

20             PROBATION OFFICER:  Correct.  And I recommended some

21   in the presentence report.  But regarding discretionary

22   condition 19, I would recommend 19(a)(ii), the home detention

23   for 12 months, restricted to your residence at all times except

24   for employment, education, religious services, medical,

25   substance abuse or mental health treatment, attorney visits,

1    court appearances, court-ordered obligations, or other

2    activities pre-approved by the probation officer.

3            THE COURT:  That will be my -- that's what I'll put

4    in.

5            Okay, but I still need now to go through other

6    conditions since it's going to be labeled supervised release.

7            So there's mandatory conditions, which include that

8    you shall not commit another federal, state, or local crime.

9            You shall not unlawfully possess a controlled

10   substance.

11           And you shall cooperate in the collection of a DNA

12   sample if it is required by the law.

13           As far as the discretionary conditions, you shall not

14   knowingly meet or communicate with Jitesh Thakkar -- if that's

15   the way you say it, I'm not sure.

16           You shall not possess a firearm, destructive device,

17   or other dangerous weapon.

18           You shall not knowingly leave from the judicial

19   district where you're being supervised.  Well, you're not going

20   to be supervised in a judicial district.  You're going to be

21   supervised from afar, so I'm not going to add Number 14.

22           You shall report to a probation officer as directed.

23           And you shall permit the probation officer to contact

24   you at a reasonable time, at home, through a reasonable

25   communication mechanism which will be set forth by the

1    Probation Office.

2         You shall notify a probation officer within 72 hours

3    if you are going to change your residence or your employer or

4    your workplace.

5         And absent a constitutional or other privilege, you

6    shall answer inquiries by the probation officer.

7         You shall notify a probation officer within 72 hours

8    if you're arrested, charged with a crime, or questioned by law

9    enforcement.

10        You shall, as a condition of your supervised release,

11   for a period of 12 months be restricted to your residence at

12   all times except for employment, education, religious services,

13   medical, substance abuse, or mental health treatment, attorney

14   visits, court appearances, court-ordered obligations, or other

15   activities that have been pre-approved by the Probation Office.

16        You shall be surrendered to a duly authorized official

17   of the Homeland Security Department for a determination on the

18   issue of deportablility by the appropriate authority in

19   accordance with the laws under the Immigration and Nationality

20   Act and established implementing regulations.

21        And if you are deported, you shall not reenter the

22   United States without obtaining, in advance, the express

23   written consent of the Attorney General or the Secretary of the

24   Department of Homeland Security.

25        PROBATION OFFICER:  Your Honor, the defendant had

1    noted earlier that he's returning home tonight.  He has a

2    flight booked.  I don't believe that condition would be

3    necessary.  And I don't believe he would be able to reenter the

4    U.S. legally anyways, so I believe we could strike that

5    condition.

6              THE COURT:  I don't think so.

7              PROBATION OFFICER:  Okay.

8              THE COURT:  I mean, so maybe that -- the condition

9    that he be duly surrendered to the Department of Homeland

10   Security, but certainly that he should not reenter if he

11   doesn't have a legitimate basis for doing so.  So I'm keeping

12   that condition.

13             You shall not incur new credit card charges -- or

14   credit charges, excuse me, or open additional lines of credit

15   without the approval of a probation officer unless you're in

16   compliance with your financial obligations that have been

17   imposed by this judgment.

18             You shall provide the probation officer with access to

19   any requested financial information necessary to monitor

20   compliance with conditions of supervised release.

21             Within 72 hours of any significant change in your

22   economic circumstances that may affect your ability to pay

23   restitution, fines, or your special assessments, you must

24   notify the probation officer of that change.

25             You shall not enter into any agreement to act as an

1    informer or special agent of a law enforcement agency without

2    the permission of the Court.

3         This will not prohibit him from working with you in

4    the future in a cooperation capacity, but it would prohibit him

5    from going as a special agent.  Okay?

6         So you can cooperate, but you can't go and take the

7    next role of undercover or something without permission of the

8    Court.

9         MR. O'NEILL:  Understood, your Honor.

10        THE COURT:  Okay?  All right.  Now, those are the

11   discretionary conditions and mandatory ones.

12        Do you have any objection to any of them?

13        MR. BURLINGAME:  No, Judge.

14        THE COURT:  Okay.  And you went over those with him

15   as -- before today?

16        MR. BURLINGAME:  Yes.  And I've gotten them all

17   written down here.

18        THE COURT:  Okay.

19        MR. BURLINGAME:  We'll go through them again.

20        THE COURT:  Okay then.

21        So what you need to know about this sentence is that

22   you have the right to appeal it, and that would be that you

23   would have to appeal within 14 days of the entry of the

24   judgment and conviction order being entered, which is probably

25   tomorrow.

1          And when you return home, you're going to be confined

2    to your home.  And when one year is up, then that sentence is

3    complete.

4          All I can say to you is that I hope that this was an

5    enormous lesson to you.  And you made some very bad judgment

6    calls in the front end to get in this situation, but you made

7    some smart judgment calls on your own on the back end to aid

8    the government to get you out of the situation.

9          So maybe focus on the latter type of behavior going

10   forward so that you can maintain a healthy and legal lifestyle

11   going forward.

12         Okay.  Anything else from anyone else?

13         MR. O'NEILL:  Not from the government, your Honor.

14         MR. BURLINGAME:  No, your Honor.

15         THE COURT:  Did I forget anything from anybody?

16         How about you, Mr. Alper?  Anything you want me to

17   add?

18         PROBATION OFFICER:  No, your Honor.  Thank you.

19         THE COURT:  Okay.  Have a good day.

20         MR. BURLINGAME:  Thank you, Judge.

21         MR. O'NEILL:  Thank you, Judge.

22         THE CLERK:  All rise.  Court is adjourned.

23      (Proceedings concluded at 2:36 p.m.)

24

25

1                    C E R T I F I C A T E

2          I certify that the foregoing is a correct transcript of the

3      record of proceedings in the above-entitled matter.

4

5

       /s/ GAYLE A. McGUIGAN                    February 3, 2020
6      Gayle A. McGuigan, CSR, RMR, CRR                     Date
       Official Court Reporter
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25